*In re* HENRY KING, JR.—(The People of the State of Illinois, Respondent-Appellee, *v.* Henry King, Jr., Petitioner-Appellant.)

First District (4th Division)   No. 82—323

Opinion filed March 3, 1983.—Modified on denial of rehearing May 19, 1983.

Mark J. Heyrman, of Chicago, and Terry S. Arbit, law student, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Stoioff, and Stephen Erhard Eberhardt, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JIGANTI delivered the opinion of the court:

On February 1, 1979, the petitioner Henry King, Jr., was found not guilty by reason of insanity (NGRI). (Ill. Rev. Stat. 1979, ch. 38, par. 1005—2—4.) The petitioner was committed to the custody of the Department of Mental Health and Developmental Disabilities (DMHDD). On May 11, 1981, the facility director of Manteno filed a notice with the court pursuant to section 5—2—4(d)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—2—4(d)(2)) of his intention to temporarily release King from Manteno for a series of 24-hour home visits. On January 20, 1982, the petitioner himself petitioned for unconditional release and for a change of venue. Following argument and a hearing, the court denied King's motions for unconditional release and change of venue and also denied the petition for temporary release. King appeals from these three orders, raising questions of equal protection and due process.

The evidence before the court consisted of the testimony of five witnesses; two psychiatrists, one mental health specialist, who was Henry King's current caseworker; Henry King; and King's wife, Bernice.

Dr. Gerson Kaplan, the first psychiatrist to testify, stated that he examined King only once for approximately one hour. His diagnosis was that King had an "anti-social personality disorder with a history of alcoholism, psychosis, and brain damage." Kaplan stated that, "at this time, *** I find no evidence of psychosis ***. My diagnosis is anti-social personality disorder. However, I do find the defendant is *dangerous to others*. So the question of whether he is subject to involuntary admission, I think, is a debatable one." (Emphasis added.) To

the question of whether or not Mr. King was mentally ill, Kaplan stated that he could only answer in a "qualified way." According to Kaplan, "anti-social personality disorder, is one of the psychiatric diagnoses that is acceptable *** and it's listed in all text books on psychiatry. So from that viewpoint it is a mental illness." However, Kaplan continued, from "[m]y experience as a forensic psychiatrist, my understanding is usually that anti-social personality disorder is not considered a mental illness."

Dr. Robert Wettstein, the second psychiatrist to testify at the hearing, testified that he had formally examined King on two occasions and had spoken to him informally on the hospital grounds on a number of occasions. Wettstein had also reviewed King's DMHDD treatment records and consulted with Dr. David Das, the psychologist who was King's former case manager at Manteno. Wettstein testified that in his opinion, King was "not mentally ill at this time." Wettstein also testified that in his opinion an antisocial personality disorder is not a mental illness. Wettstein stated that since he did not believe King to be mentally ill, he did "not think he's reasonably expected, on the basis of mental illness, to reasonably inflict serious harm in the near future." Wettstein also testified that in his opinion a series of 24-hour passes would be beneficial to King. However, Wettstein further stated that there was a "very small risk" that unsupervised home visits would cause King to be a "danger to other people." Also, there was "a small risk" that King, who had a history of alcohol abuse, would have a drink while on an unsupervised pass.

Mental health specialist, Erma Volden, King's present case manager, testified that King had not been a behavioral problem at Manteno and was looked up to by many other patients. She also testified that she had no personal knowledge of King using alcohol at Manteno. However, she did admit that she had read a report which said that King had an incident with alcohol in December of 1979.

Henry King testified that he would not take an alcoholic drink while on a home visit. He also testified that he never planned to take a drink again because it had kept him "away from his family for eight long years." On cross-examination, King testified that alcohol had brought on the killing of two women. He claimed that although alcohol was prohibited at Manteno, various staff members and patients had offered him alcohol, which he had refused.

Bernice King was the last witness to testify. She testified that she was not afraid of her husband and that in her opinion he would not "do anything to hurt me or the child." She also testified that she kept no alcoholic beverages or firearms in her home. Mrs. King testified to

the fact that she was diabetic, that she had heart trouble, and that these problems caused her only limited mobility.

At the close of the testimony, the court held that "under all the circumstances and totality of the circumstances and particularly the professional's opinion, the court is going to deny the petition" for unconditional release. The court also denied the request for 24-hour unsupervised passes.

During the course of the hearing, the court made two rulings. The court first ruled that the statutory provision of clear and convincing evidence was the appropriate standard of proof in a temporary release hearing. Second, the court ruled that King bore the burden of proof on his petition for unconditional release.

Before proceeding to the various issues raised by the petitioner on appeal, it is necessary to set out the scheme codified by the legislature in section 5—2—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—2—4) for the hospitalization, treatment and release of patients adjudicated NGRI.

Under section 5—2—4, once there has been a finding or a verdict of not guilty by reason of insanity, the defendant is ordered to DMHDD for an evaluation. Within 30 days, DMHDD reports its evaluation to the court and the court holds a hearing to determine if the defendant is subject to involuntary admission. A defendant is subject to involuntary admission if he is mentally ill and because of this condition is reasonably expected to inflict serious physical harm upon himself or another in the near future. If the court so finds, the defendant is committed to DMHDD for an indefinite period of time, not to exceed the maximum length of time, less credit for good behavior, for the maximum sentence of the most serious crime for which he was acquitted. When the facility director determines that the defendant is no longer subject to involuntary admission, he gives written notice to the court which rendered the verdict, the State's Attorney and the defense attorney. The notice sets out the basis for the recommendation, and within 30 days the court holds a hearing to determine if there has been a change of condition or whether the defendant is still subject to involuntary admission. If the NGRI initiates the request, he can file a petition for conditional release or discharge and the court sets a hearing within 30 days. If the court believes it appropriate, it can order an impartial examination of the defendant by a psychiatrist or clinical psychologist and the report is made available at the hearing. When the State makes a request for change, it has the burden of going forth. When the NGRI has initiated the request, the burden of proof rests on him. The evidence is presented in open court with the

right to confrontation, cross-examination and counsel. Findings of the court are to be by clear and convincing evidence.

■■ The petitioner's first contention on appeal is that the court erred in its ruling that the petitioner bore the burden of proof on his petition for unconditional release. The court depended upon the section in the statute which so provides. The petitioner claims that this provision of the statute is unconstitutional. Specifically, the petitioner claims that this reliance on the statute denied him due process and that the provision violates the constitutional safeguard of equal protection.

The petitioner makes his due process argument by citing cases involving the burden of proof necessary for an initial commitment in a juvenile proceeding (*In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068); and an initial commitment under the Sexually Dangerous Persons Act (*People v. Pembrock* (1976), 62 Ill. 2d 317, 342 N.E.2d 28). According to the petitioner, these cases support a conclusion that where a liberty interest is at stake, due process requires that the burden be on the State to prove beyond a reasonable doubt every element of the offense charged.

This issue is apparently one of first impression in Illinois. However, the State cites us to a case in another jurisdiction which is exactly on point. In *Lublin v. Central Islip Psychiatric Center* (1977), 43 N.Y.2d 341, 401 N.Y.S.2d 466, 372 N.E.2d 307, the New York Appellate Court held that there was no reason to depart from the traditional rule which placed the burden of proof upon the petitioner. The court stated that "the burden which is placed on petitioner is neither excessive nor novel, for the burden of proof is normally placed upon the party who is seeking affirmative relief." (43 N.Y.2d 341, 344, 401 N.Y.S.2d 466, 468, 372 N.E.2d 307, 310.) The court also set out the rationale for its holding. The court reasoned:

"The petitioner is obviously asserting his very strong and basic interest in liberty, for it can no longer be denied that commitment, albeit for treatment, does involve a substantial deprivation of liberty. The State, on the other hand, is asserting both its *parens patriae* interest in the mentally incompetent, with its concomitant obligation to protect them from harm to either themselves or others, and its responsibility to exercise its police powers to protect its citizenry from an individual who has given proof positive that he is in fact dangerous to both society and himself. We find that in such a case, the State's interest must outweigh that of the individual, and it is the people of the State who must be given the benefit of the doubt. *** 'Where the

underlying act was of extreme violence, reasonable medical doubts and judicial doubts should be resolved in favor of the public *** and, a fortiori, the burden of proof should devolve upon the detainee to show that he no longer constitutes a danger to himself or others'." 43 N.Y.2d 341, 345, 401 N.Y.S.2d 466, 469, 372 N.E.2d 307, 310.

Because we find both the result and rationale cited above to be persuasive, we believe that a statute requiring the petitioner to bear the burden of proof in showing change of condition in a release hearing does not violate the petitioner's constitutional right to due process. Furthermore, since the petitioner is only able to cite us to cases involving initial commitment proceedings and not release proceedings to support his due process argument, we believe the petitioner's reliance upon these cases is misplaced.

■ The petitioner also argues that this statutory allocation of burden of proof violates his constitutional right to equal protection. The petitioner claims that it is unequal treatment to require a NGRI to bear the burden of proof in a release hearing which he initiates while requiring the State to bear the burden of proof in a release proceeding which it initiates. The petitioner specifically claims that this distinction cannot withstand the "close scrutiny" required by a court whenever fundamental rights and liberties are asserted under the equal protection clause. The petitioner cites *Harper v. Virginia Board of Elections* (1966), 383 U.S. 663, 16 L. Ed. 2d 169, 86 S. Ct. 1079, which deals specifically with voter qualifications, for the proposition that fundamental rights require "close scrutiny."

We find the petitioner's claim that the allocation of the burden of proof under the statute violates equal protection to be unfounded. The petitioner's argument presumes that the statute purports to impose a restriction on a fundamental right, thus creating a "suspect classification" and invoking the rule that in order to sustain its validity the State bears the burden of showing that the classification was related to some compelling State purpose. We do not agree that the statute, through allocation of the burden of proof, imposes any such restriction on a fundamental right. There is no vested right in particular rules of evidence such as burden of proof. 16A C.J.S. *Constitutional Law* sec. 562 (1956); *People v. Morrison* (1932), 125 Cal. App. 282, 13 P.2d 800, *appeal dismissed* (1933), 288 U.S. 591, 77 L. Ed. 970, 53 S. Ct. 401.

The question of whether a statutory allocation of the burden of proof violates equal protection is to be decided on the basis of whether the classification is reasonably related to a legitimate govern-

mental objective. As the Illinois Supreme Court held in *Garcia v. Tully* (1978), 72 Ill. 2d 1, 377 N.E.2d 10, "[w]hether the course chosen by the General Assembly to achieve a desired result is either wise or the best means available is not a proper subject of judicial inquiry. [Citation.] If there is a reasonable basis for the classification and it bears a reasonable and proper relation to the purposes of the Act, the classification is not unreasonable. [Citation.]" 72 Ill. 2d 1, 10-11, 377 N.E.2d 10, 14.

The case of *Lublin v. Central Islip Psychiatric Center* (1977), 43 N.Y.2d 341, 401 N.Y.S.2d 466, 372 N.E.2d 307, already quoted in part above, sets out the specific rationale as to why such a statutory allocation of the burden of proof in a NGRI release hearing does not violate equal protection. The court explained:

> "It is beyond doubt that petitioner was both insane and dangerous at the time he murdered his wife and attempted to take his own life; indeed, it is only because of his insanity that he is relieved of criminal liability. Given the clear existence of this condition, as evidenced by the admitted commission of a violent act, it is appropriate that the condition be presumed to continue until the contrary is proven." (43 N.Y.2d 341, 344, 401 N.Y.S.2d 468, 469, 372 N.E.2d 307, 310.)

Because we believe that the correct standard is "reasonable relation" in determining whether or not the statutory allocation of burden of proof here under attack violates equal protection and because we find the reasoning set out in *Lublin* to be persuasive as to why the petitioner should carry the burden of showing change of condition, we find no merit in the petitioner's claim that the statute violates equal protection.

The petitioner next argues that he was not "subject to involuntary admission" because the evidence presented at the hearing did not support the conclusion that he was mentally ill as required by the statute. Specifically, the petitioner claims that the evidence only supports the conclusion that he is suffering from "anti-social personality disorder" and not a mental illness. Although Dr. Wettstein testified that an antisocial personality disorder is not a mental illness, Dr. Kaplan testified that it is a mental illness. Since the evidence as to whether the petitioner was mentally ill was conflicting, it was within the province of the trier of fact to resolve this issue. (*Fopay v. Noveroske* (1975), 31 Ill. App. 3d 182, 334 N.E.2d 79.) Thus the trial court could reasonably conclude that the petitioner was still mentally ill.

The petitioner next argues that the "clear and convincing" standard required by the statute violates due process and equal pro-

tection. Specifically, the defendant claims that the State should be required to prove beyond a reasonable doubt that the proposed temporary release was inappropriate because a release hearing is a criminal proceeding and not a civil proceeding. The petitioner supports his claim that this is a criminal proceeding by arguing that the proceedings are provided for under the Unified Code of Corrections and that the length and nature of confinement are controlled by the criminal court. We find this argument to be unpersuasive. The NGRI release hearing arises out of a prior criminal proceeding and therefore although it is a unique type of civil hearing, it is appropriately found under the Unified Code of Corrections. Furthermore, the Illinois Supreme Court in the case of *In re Stephenson* (1977), 67 Ill. 2d 544, 367 N.E.2d 1273, specifically found that requiring a less demanding standard of proof for involuntary commitment proceedings than the reasonable doubt standard applicable to criminal trials does not violate due process and equal protection. The court held that the clear and convincing proof standard was most appropriate in light of the conflicting interest of the individual and society. Because we find that the release hearing is civil in nature and not criminal and because of the supreme court's decision in *Stephenson*, we find no merit in the petitioner's claim.

■ The petitioner's final issue on appeal is that the trial court improperly denied his motion for a change of venue on the basis of prejudice. The petitioner claims that he filed his verified petition in a timely manner before the judge had ruled on any substantial issue in the case and that the petition was in proper form. The petitioner filed his petition 10 days after the facility director had filed a petition for King's temporary release. The specific acts of prejudice which the petitioner alleged were that the judge had recently denied a release request for another NGRI and had commented that her release petition was filed only two months after she had been declared NGRI; that the judge had denied this other NGRI's motion for a free transcript of her hearing and then granted her one shortly thereafter; and that the judge had ruled against the other NGRI on some other points of law. The petition also alleged that the judge had denied King offgrounds privileges, a free transcript and had also ruled against King on various other motions.

We do not agree that the trial court improperly denied the petitioner's motion for a change of venue. The verified petition filed by King was not timely filed as the petitioner claims. The judge had already ruled on substantive issues in King's case because, according to statute, a release hearing is no more than a continuation of an invol-

untary commitment proceeding. King's initial commitment hearing was held more than two years before he filed this verified petition. The fact that the legislature intended NGRI proceedings to be ongoing proceedings is set out in the scheme codified for such proceedings under section 5—2—4 of the Unified Code of Corrections which requires that all hearings regarding NGRI's be filed in the court which "rendered the verdict." (Ill. Rev. Stat. 1979, ch. 38, par. 1005—2—4(e).) Therefore, the petitioner's contention that his petition for change of venue was filed before the hearing began and before the judge ruled on any substantial issue has no basis in fact.

Furthermore, we do not believe that the allegations contained in the petitioner's verified complaint support a claim of prejudice. Even if the petitioner's allegations are taken as true, they do no more than support a claim that the judge had ruled adversely on motions submitted to him by King and by another NGRI in a prior release hearing. Allegations of adverse rulings are not the kind of allegations of prejudice necessary in a showing for a change of venue. See *People v. Jones* (1972), 7 Ill. App. 3d 146, 287 N.E.2d 227; *Schipper & Block, Inc. v. Carson Pirie Scott & Co.* (1970), 122 Ill. App. 2d 34, 256 N.E.2d 854.

For the above reasons we affirm the orders of the trial court.

Affirmed.

ROMITI, P.J., and JOHNSON, J., concur.