THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HERMAN WILLIAMS, Defendant-Appellant.

First District (4th Division)   No. 83—3086

Opinion filed January 16, 1986.

Edwin F. Mandel Legal Aid Clinic, of Chicago (Mark J. Heyrman and Charles D. Weisselberg, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Joel Leighton, and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LINN delivered the opinion of the court:

Following a bench trial, respondent, Herman Williams, was acquitted by reason of insanity of attempted murder and aggravated battery. Williams was ordered to the Department of Mental Health and Developmental Disabilities (DMHDD) on an inpatient basis for an evaluation to determine whether he was subject to involuntary admission to DMHDD pursuant to section 5—2—4(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(a)). After a hearing, Williams was found subject to involuntary admission and was remanded to DMHDD for a period of 15 years. On appeal, Williams contends that the trial court committed reversible error in that: (1) he was prematurely committed to DMHDD; (2) the State failed to prove by clear and convincing evidence that he was subject to involuntary admission to DMHDD; (3) he was committed to a facility which does not offer him the proper treatment; and (4) he was denied effective assistance of counsel.

We affirm.

BACKGROUND

On November 12, 1982, following a bench trial, respondent, Herman Williams, was acquitted by reason of insanity (Ill. Rev. Stat. 1981, ch. 38, par. 115—3(b)) of attempted murder (Ill. Rev. Stat. 1981, ch. 38, pars. 8—4, 9—1) and aggravated battery (Ill. Rev. Stat. 1981, ch. 38, par. 12—4(b)(1)) of his mother. It was stipulated at trial that on July 31, 1982, Williams walked into his mother's kitchen and with a nine-inch knife stabbed his mother twice in the arm and three times in the chest.

Dr. Gerson Kaplan, a psychiatrist employed by the Cook County Psychiatric Institute, testified in Williams' case in chief. Kaplan asserted that Williams was suffering from paranoid schizophrenia, and that his attack upon his mother stemmed from this disease. Kaplan also testified that because of this disorder, Williams was unable to

conform his conduct to the law.

At the close of the trial, the trial court determined that Williams had attacked his mother with the intent to commit murder. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1).) However, the trial court also found that Williams was insane at the time of the attack, and therefore he was not guilty by reason of insanity. Ill. Rev. Stat. 1981, ch. 38, par. 115—3(b).

Immediately after the acquittal, the State requested the immediate involuntary transfer of Williams into the custody of the DMHDD. The trial court indicated that it would not order Williams into the custody of DMHDD without first determining whether he posed a danger to himself or others. The State called Dr. Kaplan to the stand. Kaplan, who had testified on Williams' behalf at trial, stated that in his opinion, Williams constituted a danger to others such that he was subject to involuntary commitment. The assistant public defender representing Williams refused to participate in the further proceedings and did not cross-examine Kaplan, object to any of the State's questions asked of Kaplan, or offer any evidence on Williams' behalf. Defense counsel contended that the trial court was proceeding contrary to the requirements and procedures set forth in the statute relating to involuntary commitment. Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4.

Following the State's examination of Kaplan, the trial court determined that Williams did pose a danger to others. The court ordered Williams to the DMHDD facility at Manteno Mental Health Center as an inpatient for an evaluation as to whether he was subject to involuntary admission pursuant to section 5—2—4(a) of the Unified Code of Corrections. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(a).) The trial court also ordered that the report be returned to it within 30 days, and directed that Dr. Kaplan's written report of his findings regarding Williams' eligibility for involuntary admission be forwarded to DMHDD. The trial court then determined that Williams was eligible for a 15-year period of confinement apparently pursuant to section 5—2—4(b) of the Unified Code of Corrections. Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(b).

On January 17, 1983, a DMHDD report prepared by Dr. Robert Wettstein was presented to the trial court. The report stated that Williams was not subject to involuntary admission. On the basis of this report, Williams on February 18, 1983, filed a petition for discharge. The petition was later withdrawn by William's defense counsel.

On February 24, 1983, Williams appeared before the trial court for hearing on the DMHDD report. At that time, the State called Dr. Wettstein to the stand. Wettstein testified that Williams' paranoid

schizophrenic condition was in remission with medication, and recommended that Williams follow a course of drug and psychiatric treatment on the outpatient basis at the Edgewater Mental Health Center. Wettstein acknowledged that Williams' disorder could reoccur if Williams were to abuse drugs and alcohol.

The hearing was continued to February 25, 1983, at which time the State again called Dr. Kaplan. Kaplan testified that he had re-examined Williams that day, and that Williams was "not presently subject to involuntary admission." The hearing was continued by the trial court to determine whether the DMHDD report was in compliance with the requirements of the Unified Code of Corrections. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(a).) The trial court also ordered that Williams be examined by Dr. Gilbert Bogen, another psychiatrist at the Cook County Psychiatric Institute.

The hearing was continued to August 18, 1983, at which time the State called Dr. Bogen to the stand. Bogen stated that he examined Williams on July 28, 1983, and that during the interview, Williams' thought process deteriorated and Williams displayed psychotic symptoms. Bogen also testified that prior to the examination he read reports from the facility where Williams was sent for his evaluation (Manteno Mental Health Center). Bogen said that the reports indicated that Williams' condition had suddenly deteriorated in March and April of 1983. According to the reports, at that time Williams had spoken of killing people. This was also testified to by the case worker from Manteno Mental Health Center in charge of Williams' case. Based on his examination and the reports from Manteno Mental Health Center, Bogen determined that Williams suffered from paranoid schizophrenia, and that Williams posed a danger to others. In Bogen's opinion, Williams was subject to involuntary admission and should therefore be treated as an inpatient.

On cross-examination, it was established that Dr. Bogen had not read reports by Dr. Wettstein filed after Williams' condition had allegedly improved subsequent to a change in his medication. After reading reports dated June 29, 1983, and July 13, 1983, Dr. Bogen stated that his opinion regarding Williams' status was unchanged.

Defense counsel called Dr. Wettstein to the stand in rebuttal. Wettstein testified that he did not believe that Williams would benefit from further hospitalization and that he should be released to an outpatient treatment program.

On September 29, 1983, the hearing reconvened and the parties gave their final arguments. The trial court ruled that based on the evidence, Williams was subject to involuntary admission. The court

made it clear that it had resolved the conflicting testimony of the psychiatrists in favor of Bogen, and that he did not rely on Kaplan's testimony of November 12, 1982. Williams was remanded to Manteno Mental Health Center pursuant to section 5—2—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4).

OPINION

I

Williams contends that he was denied due process of law when the trial court involuntarily committed him to DMHDD for a period of 15 years without the benefit of an evaluation as required by the Unified Code of Corrections provision which governs proceedings after acquittal by reason of insanity. Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4.

Section 5—2—4(a) of the Unified Code of Corrections states in pertinent part:

"After a finding or verdict of not guilty by reason of insanity under Section 104—25, 115—3, or 115—4 of The Code of Criminal Procedure of 1963, the defendant shall be ordered to the Department of Mental Health and Developmental Disabilities for an evaluation as to whether he is subject to involuntary admission or in need of mental health services. The order shall specify whether the evaluation shall be conducted on an inpatient or outpatient basis.

The Department shall provide the Court with a report of its evaluation within 30 days of the date of this order. The Court shall hold a hearing as provided under the Mental Health and Developmental Disabilities Code of 1978 to determine if the individual is: (a) subject to involuntary admission; (b) in need of mental health services on an inpatient basis; (c) in need of mental health services on an outpatient basis; (d) a person not in need of mental health services. The Court shall enter its findings." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(a).)

Williams contends that he was prejudiced because the procedure for involuntary admission outlined in this statute was not followed by the trial court. In support of this contention, Williams cites the statement of the trial court that:

"[T]he Court would find that the defendant is not guilty of these offenses by reason of insanity.

All right, now, it is required that we have, at least insofar as I am concerned, that we make a determination as to the

defendant's—whether or not he should be involuntarily committed."

Williams maintains that this statement evidences the fact that the trial court did not follow the required procedure in this case and that the trial court's decision amounts to having a commitment hearing without the benefit of a DMHDD evaluation. We do not agree with this interpretation of the facts in this case, and find no basis for this conclusion in either the statute involved, or in the record now before us.

The plain language of section 5—2—4(a) makes it apparent that it would be a violation of due process to involuntarily commit Williams without first finding that he is mentally ill as well as dangerous to himself or others. It is equally clear from this statute that the purpose of the DMHDD evaluation provided by section 5—2—4(a) is to determine whether Williams' acquittal based on insanity automatically poses Williams as a threat to himself or others. However, even a cursory reading of this paragraph of the statute reveals that the trial judge must first make a determination as to whether the DMHDD evaluation referred to above "should be conducted on an inpatient or outpatient basis." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(a).) This provision gives the trial judge the power to determine whether a person acquitted by reason of insanity should automatically be temporarily committed for his DMHDD evaluation until the trial court can act upon the recommendation in DMHDD's 30-day report.

When we view the record in its totality, it is clear that the trial judge's initial order remanding Williams to DMHDD on an inpatient basis did not amount to a permanent involuntary commitment. The order entered by the trial court stated that Williams was being placed with DMHDD for an evaluation to determine whether he was subject to involuntary admission, and that the report was to be returned to the trial court within 30 days as required by the Unified Code of Corrections. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(a).) Therefore, we do not interpret the examination of Dr. Kaplan which occurred after Williams' acquittal by reason of insanity to be more than a method by which the trial judge determined that Williams' condition was such that a DMHDD evaluation should take place on an inpatient basis. We also note that the record contains a number of references that the initial commitment hearing, albeit unusually long and drawn out, did not occur until after the DMHDD report was returned to the trial court as ordered on November 12, 1982.

Consequently, we conclude that Williams was not denied due process of law when he was placed with DMHDD for an evaluation on an

inpatient basis, and his contentions that the November 12, 1982, proceedings subsequent to his acquittal constituted a full blown commitment hearing are doomed.

■ We emphasize that we are well aware of the fundamental liberty interest at stake in this case. However, as we have indicated above, we do not view the temporary commitment of an insane acquittee for a DMHDD evaluation to be violative of the acquittee's due process rights. The plain language of section 5—2—4 reflects the legislature's concern, not only for the societal interest of protecting the community from one who is unable to control his conduct, but also for the individual who is likely to endanger himself. The record in this case evinces that the trial judge was attempting only to effect this statutory purpose by temporarily placing Williams for an evaluation with DMHDD on an inpatient basis.

## II

Williams also contends that the trial court erred because it predetermined the period of his maximum commitment without the benefit of a detailed assessment of his mental condition, and before he had an opportunity to present evidence to the contrary. Williams relies on *People v. Diaz* (1971), 1 Ill. App. 3d 988, 275 N.E.2d 210, to support his contention that it was error for the trial court to find him eligible for commitment for 15 years before he was evaluated by DMHDD. *Diaz*, however, is inapposite to the instant case.

In *Diaz*, the trial court entered a finding of guilty before defendants had an opportunity to put on their case. While we agree that this is the antithesis of a fair trial, the facts in *Diaz* present an entirely different situation than does the case at bar. Here, Williams was afforded his constitutional guaranty of due process of law by enjoying the protection of his day in court. At trial, Williams stipulated that he stabbed his mother, proving that he committed a criminal offense. Williams' stipulation that he committed a criminal offense and the trial court's decision that he committed the act because of mental illness distinguishes this case from *Diaz*.

■ In this case, the trial court determined that Williams was eligible for a 15-year period of confinement pursuant to section 5—2—4(b) of the Uniform Code of Corrections, which provides in pertinent part:

"If the Court finds the defendant subject to involuntary admission or in need of mental health services on an inpatient basis, the admission, detention, care, treatment or habilitation, transfer, review proceedings, and discharge of the defendant

after such order shall be under the Mental Health and Developmental Disabilities Code of 1978, except that the initial order for admission of a defendant acquitted of a felony by reason of insanity shall be for an indefinite period of time; provided, however, that such period of commitment shall not exceed the maximum length of time that the defendant would have been required to serve, less credit for good behavior, before becoming eligible for parole had he been convicted of and received the maximum sentence for the most serious crime for which he has been acquitted by reason of insanity ***." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(b).)

This period of confinement itself is proper given the fact that the most serious crime that Williams was acquitted of by reason of insanity is attempted murder, a Class X felony with a maximum sentence of 30 years. (Ill. Rev. Stat. 1981, ch. 38, pars. 8—4(c), 1005—8—1(a)(3).) Here Williams' maximum period of eligibility for confinement is 15 years. This maximum period of eligibility is based on the nature of the offense and not on the acquittee's mental condition. Thus, it is apparent that this *maximum* period of eligibility would not be subject to change whatever the result of the DMHDD evaluation. Accordingly, Williams was not denied due process despite the fact that the trial court determined his maximum period of commitment before the DMHDD evaluation was submitted to the trial court.

We also emphasize that a commitment under section 5—2—4 is really one of indefinite character despite any determination of the maximum period of eligibility. "Upon operation of this statute, the committed acquittee is entitled to be released when he has recovered his sanity and is no longer dangerous to society, *even if this is prior to the maximum term of involuntary commitment set by the trial court.*" (Emphasis added.) (*People v. Hampton* (1983), 121 Ill. App. 3d 273, 277, 459 N.E.2d 985, 988; see also Ill. Rev. Stat. 1981, ch. 38, pars. 1005—2—4(d), (h).) Thus, the trial court's determination prior to DMHDD evaluation that Williams was eligible to be confined for 15 years did not mean that he would in fact be confined for 15 years; nor does it mean he will be confined for 15 years even though he has been found subject to involuntary admission. Consequently, Williams was not prejudiced by the fact that the trial court determined that he was eligible for 15 years of confinement immediately upon his acquittal by reason of insanity.

III

Williams also contends that the State failed to prove by clear and

convincing evidence that he was in need of mental health services on an inpatient basis, and that the trial court erroneously placed the burden of proof on him because it involuntarily committed him solely because DMHDD failed to produce a detailed outpatient plan for his treatment.

## A

■ Williams notes that two of three psychiatrists who testified at the commitment hearing stated that he was not subject to involuntary admission. Williams further urges this court to disregard the testimony of Dr. Bogen, who opined that Williams was subject to involuntary admission (and whose opinion the trial court relied upon), because Bogen failed to use the language "reasonably expected" to inflict "serious harm" when rendering his opinion. We find that the record provides ample evidence for the trial court's finding that Williams should be involuntarily committed to DMHDD.

Under section 5—2—4 of the Unified Code of Corrections, there are two ways in which a defendant acquitted by reason of insanity may be involuntarily committed to DMHDD: He may either be found (1) "subject to involuntary admission"; or (2) "in need of mental health services on an inpatient basis." The term "subject to involuntary admission" is defined in section 5—2—4 as follows:

" 'Subject to involuntary admission' means: a defendant has been found not guilty by reason of insanity and:

(i) who is mentally ill and who because of his mental illness is reasonably expected to inflict serious physical harm upon himself or another in the near future; or

(ii) who is mentally ill and who because of his illness is unable to provide for his basic physical needs so as to guard himself from serious harm." (Ill. Rev. Stat. 1981, ch. 38, pars. 1005—2—4(a)(1)(A)(i), (ii).)

The term "in need of mental health services on an inpatient basis" is defined as follows:

" 'In need of mental health services on an inpatient basis' means: a defendant who has been found not guilty by reason of insanity who is not subject to involuntary admission but who is reasonably expected to inflict physical harm upon himself or another and who would benefit from inpatient care or is in need of inpatient care." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(a)(1)(B).)

Williams contends that there is no evidence in the record to support his confinement under the above standards because there is no ex-

plicit medical opinion that Williams is reasonably expected to harm himself or others. We disagree.

The testimony adduced during the commitment hearing was amply sufficient to support the trial court's decision that Williams be committed to DMHDD. The record indicates that Drs. Kaplan and Wettstein found that Williams was not subject to involuntary admission prior to March 1983. Dr. Bogen, however, noted that certain reports from the DMHDD facility where Williams was evaluated indicated that his condition had deteriorated in March and April of 1983. A report dated April 13, 1983, described Williams' behavior as "variable" and displaying "inappropriate hostility." In addition, the report stated that Williams named several persons whom he wished to kill, and that his personal hygiene and physical appearance had diminished.

Dr. Bogen also conducted an evaluation of Williams' condition on July 28, 1983. Bogen testified that during this one and one-half hour examination, Williams' "thinking process just fell apart," indicating a tenuous state of remission. Bogen stated that based on the reports that he read, and on his examination, Williams' condition could easily deteriorate as it did at the hospital, regardless of how much medication he was receiving. Even after Bogen was presented with reports made by Dr. Wettstein after April 13, 1983, Bogen remained steadfast in his opinion that Williams "does pose a potential danger toward others." Based on the entire record, it is clear that Bogen's opinion sufficiently states an "explicit medical opinion."

Despite Williams' contention that the State failed to establish an explicit medical opinion by clear and convincing evidence, we note that it is the trier of fact, and not the psychiatrists, who is to consider and weigh all of the evidence in this case. (See *In re Stephenson* (1977), 67 Ill. 2d 544, 367 N.E.2d 1273; *In re King* (1983), 114 Ill. App. 3d 346, 448 N.E.2d 887.) In the instant case, the trial court explicitly stated that it resolved the conflicting testimony of the psychiatrists in favor of Bogen, finding Wettstein's testimony unreliable given Williams' sudden and unexpected decline in March and April of 1983 after Wettstein had testified that Williams was in remission, and finding Kaplan's testimony unpersuasive because it came before Williams came out of remission. We agree with the trial court's assessment and believe that the substance of Bogen's testimony clearly shows Williams to be "one who is mentally ill and who because of his mental illness is reasonably expected to inflict serious harm upon himself or another in the near future." Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(a)(1)(A)(i).

B

■ The burden of proof in this case was upon the State to prove that Williams was in need of inpatient care. (*People v. Sanchez* (1984), 126 Ill. App. 3d 746, 752, 467 N.E.2d 1085, 1090.) Williams argues that the burden was improperly shifted to him because the trial court conducted the proceedings as if they constituted a discharge hearing rather than a commitment hearing, and because the trial court required him to prove the sufficiency of the DMHDD outpatient treatment plan.

At trial, it was proved by stipulation that Williams had committed a criminal act in stabbing his mother. In addition, the trial court determined that there was a reasonable doubt as to Williams' sanity. Both of these factors may be considered by the trial court in reaching a determination as to the status of an insanity acquittee. (*People v. Sanchez* (1984), 126 Ill. App. 3d 746, 750, 467 N.E.2d 1085, 1089.) In addition, the State presented the testimony of Dr. Bogen, whose explicit medical opinion was that Williams was potentially dangerous to others and in need of inpatient care. Based on the totality of the evidence presented in this case, it is clear that the trial court made its decision that Williams was subject to involuntary admission based on his mental condition was proved by clear and convincing evidence by the State. As a result, there is no merit in Williams' contention that the burden of proof shifted to him because DMHDD failed to produce an adequate outpatient treatment plan; nor in his contention that the trial court treated this as a discharge hearing, which it is apparent it did not.

IV

Respondent contends that the trial court's order committing him to DMHDD on an inpatient basis deprives him of due process of law. Respondent argues that he is in need of drug abuse counseling services which are only available on an outpatient basis, and maintains that therefore he is being denied adequate treatment through confinement at Manteno Mental Health Center. The State contends, on the other hand, that Williams is receiving adequate treatment at Manteno because he receives medication and interacts with staff and other patients through various ward activities.

Under the Mental Health Code, mental health patients are to be "provided with adequate and humane care and services in the least restrictive environment." (Ill. Rev. Stat. 1981, ch. 91½, par. 2—102(a).) Such care and services are to be determined by what is "reasonable in light of identifiable liberty interests and the circumstances

of the case." *Youngberg v. Romeo* (1982), 457 U.S. 307, 73 L. Ed. 2d 88, 102 S. Ct. 2452; *People v. Dixon* (1982), 91 Ill. 2d 518, 530, 440 N.E.2d 117, 123.

■■ In determining what type of treatment is reasonable in this case, we iterate the fact that the purpose of commitment following an insanity acquittal is to treat the individual's mental illness, and at the same time protect him and society from his potential dangerousness. (*Jones v. United States* (1983), 463 U.S. 354, 77 L. Ed. 2d 694, 103 S. Ct. 3043.) In the case before us, the trial court, based on the evidence, concluded that Williams poses a potential threat to others. Given this, we find Williams' confinement and treatment at Manteno to be reasonable under the circumstances of the case.

We note that Williams bases his argument that he should receive outpatient treatment almost entirely on the testimony of Dr. Wettstein, who stated that Williams would not benefit from further hospitalization. The trial court, however, did not find Wettstein's opinion to be reliable, and properly found Williams subject to involuntary admission to DMHDD because he poses a threat to others.

Based on the above finding, we believe that Williams' commitment to DMHDD and his treatment at Manteno Mental Health Center strike a proper balance between his liberty interest, and the purpose of his commitment to protect him and society from his potential dangerousness. We do not see this as violative of either his right to due process of law, or his rights under section 2—102(a) of the Mental Health Code (Ill. Rev. Stat. 1981, ch. 91½, par. 2—102(a)).

V

Respondent's final contention is that he was denied effective assistance of counsel because the assistant public defender refused to participate in the post-trial proceedings on November 12, 1982. We do not agree.

■■ The standard of review for judging a claim of ineffective assistance of counsel is whether counsel's representation is so constitutionally deficient that it produced substantial prejudice to defendant without which the result would probably have been different. (*People v. Carroll* (1985), 131 Ill. App. 3d 365, 475 N.E.2d 982.) This depends on the facts and circumstances of each case as set forth in the record, rather than focusing upon isolated instances occurring during the course of the proceedings. (*People v. Key* (1984), 122 Ill. App. 3d 491, 461 N.E.2d 517.) It is defendant's burden to establish clearly both counsel's incompetence and the resultant prejudice. *People v. Rodriguez* (1983), 117 Ill. App. 3d 761, 454 N.E.2d 13.

■ When we view the record in this case as a whole, we find that the assistant public defender represented Williams vigorously throughout the admission proceedings. The transcript of proceedings indicates that defense counsel cross-examined the State's witnesses on February 24, 1983, February 25, 1983, and on August 18, 1983, in order to elicit favorable testimony and destroy the credibility of Dr. Bogen, who was called to testify by the State. Moreover, the assistant public defender made lengthy arguments on February 25, 1983, and August 18, 1983, opposing Williams' involuntary admission to DMHDD. Defense counsel also called Dr. Wettstein to the stand to rebut the testimony of Dr. Bogen, who opined that Williams was subject to involuntary admission.

The record in this case also indicates that Williams has failed to present any evidence tending to show that the assistant public defender's refusal to participate in the November 12, 1982, proceedings in any way prejudiced him with respect to his subsequent commitment pursuant to section 5—2—4(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(a)). Without vainly repeating the evidence in this case, we have established that the November 12, 1982, proceedings did not constitute a commitment proceeding, nor did the 15-year commitment order prejudice his case. Furthermore, the trial court explicitly stated that the November 12, 1982, testimony of Dr. Kaplan that Williams was subject to involuntary admission in no way served as a basis for the court's reaching that same determination on September 29, 1983.

Consequently, whether we view it singularly or within the context of the totality of the record, the assistant public defender's refusal to participate in the November 12, 1982, post-trial proceedings did not deny Williams effective assistance of counsel.

For all of the reasons stated above, the judgment of the trial court is affirmed.

Affirmed.

JIGANTI and JOHNSON, JJ., concur.