FOURTH DIVISION

March 31, 2000

No. 1-99-3426

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County.

)

v. ) 

)

LEE ROBIN, ) Honorable

) James P. Flannery,

Defendant-Appellee. ) Judge Presiding.

JUSTICE SOUTH delivered the opinion of the court:

Defendant was charged for the August 1988, murders of his wife and daughter.  He used an axe in the killing of his wife and  drowned their daughter.  Defendant was admitted to the Elgin Mental Health Center (Elgin) in November 1988, after a finding that he was unfit to stand trial.  On April 21, 1989, defendant was found fit to stand trial.  After a bench trial, he was adjudicated not guilty of the murders by reason of insanity (NGRI), and readmitted to Elgin.

On September 17, 1999, the trial court granted defendant's conditional release pursuant to a recommendation plan submitted by the Department of Human Services (DHS).  The plan as presented 
was accepted by the court but modified to include, among other conditions, blood testing twice a month for lithium levels.  The State's motion to reconsider was denied.

Previously, on March 26, 1992, a recommendation for release was submitted to the circuit court by DHS on defendant's behalf.  This recommendation was amended to a request for unsupervised off-ground passes.  A hearing on this matter was held and the circuit court heard extensive testimony from psychiatrists opposed to the recommendation as well as from psychiatrists in support of the recommendation.  This court affirmed the circuit court's denial of the recommendation in 
People v. Robin
, 264 Ill. App. 3d 936 (1994).  

The following testimony was adduced at the hearing on the instant petition for conditional release:

The State called Dr. Linda Gruenberg, a board certified psychiatrist, and Dr. Randi Zoot, a psychologist, as witnesses.  Dr. Gruenberg received numerous documents generated by various agencies which had dealt with defendant in preparation for her interviews with him.  She interviewed defendant for a total of 7¼  hours.  Based upon the interviews and her review of the documents, Dr. Gruenberg formed an opinion within a reasonable degree of psychiatric certainty that defendant suffers from Bipolar Disorder II.  She stated that such a mood disorder is characterized by periods of elation, increased energy and feeling better than one would normally feel when feeling good.  Defendant's disorder is treatable but it is not curable.  Defendant is presently being treated with Sinequan, an anti-

depressant, and Lithium, a mood stabilizer, which Dr. Gruenberg said he must take if he is to avoid a relapse of great severity.  She also found defendant sensitive to stressful situations.  Dr. Gruenberg opined that defendant should be granted unsupervised off-site passes as called for in the Transitional Plan
(footnote: 1) but should not be conditionally released to an off-site housing program.  

Dr. Zoot, after reviewing various records, interviewed defendant for 3½ hours.  She also conducted psychological testing of defendant, which tests included the Minnesota Multi-Phasic Personality Inventory (MMPI), the Million Clinical Multi-Axle Inventory 3 (MCI3), and the Rorschach test.  Dr. Zoot testified that the results of the MMPI test showed defendant to be defensive, very unwilling to disclose personal information, guarded, showing a lack of insight into what makes him tick, what motivates him.  The MCI3 test disclosed that defendant has a distinct tendency to avoid disclosing personal information.  The Rorschach test revealed dysphoric, depressed feelings, which could result from a sense of loneliness.  The test showed that defendant had inadequate resources to deal with the everyday stresses of life.  Based upon the interviews with defendant and the results of the tests, Dr. Zoot testified that she did not believe defendant should be conditionally released until his ability to handle stress was better understood.

Ronald Wedell, defendant's first witness, a board certified clinical social worker, has worked at Elgin for a number of years and known defendant since he came to the William White Cottage at Elgin in January 1995.  Wedell oversees defendant's day-to-day progress, evaluates defendant's mental condition and coordinates with IRC and Northwest concerning his treatment.  The William White Cottage is considered a non-secured setting.  While residing at White Cottage, defendant travels to other locations at Elgin for various activities using his unsupervised on-grounds pass privilege.  There have been no problems with his use of this privilege.

Wedell testified that the patients at White Cottage are given their medications at prescribed times.  While defendant is not forced to take his medications, if he refuses, the staff would meet with him in order to find out the reason for his refusal.

Wedell believes that defendant has received the maximum amount of benefits from inpatient treatment and that he should now receive treatment on an outpatient basis.  Defendant has a mental illness but it is in full remission.  Wedell does not believe defendant is a danger, nor does he believe that he will inflict harm upon himself or others because of his illness.  He also believes defendant can provide for his basic physical needs.

Dr. Jack Green, a psychologist and Director of Behavioral Studies and Group Therapy at Isaac Ray, has seen defendant in individual cognitive restructuring therapy since 1993.  Since treatment began, Dr. Green has seen improvement in defendant in all areas.  Dr. Green testified that defendant's sense of empathy has greatly improved as to how he deals with others.  Dr. Green stated that Elgin itself is a stressful situation, so, in that regard, defendant has been dealing with stress for years.  He testified that defendant is committed to his treatment and pointed out that at one time defendant asked for an increase in his medication because he felt his current dosage was inadequate.  Dr. Green does not believe that defendant is a danger to himself or to others.  He also believes defendant can provide for his own basic needs and that he will benefit more from treatment if his environment changes and there are new issues with which he can deal.  He stressed that for defendant's illness to remain in remission, it is important that he remain in therapy and continue taking medication.  Dr. Green stated that the conditional release plan will adequately regulate and oversee defendant's condition, and that the plan can be terminated at anytime if defendant's behavior warrants it.  It is his professional opinion that defendant is ready for conditional release.

Dr. Jonathan Kelly, a psychiatrist and Medical Director at Isaac Ray, has seen defendant in individual therapy once a month since 1991.  Dr. Kelly agreed that defendant has a bipolar II disorder that has been in full remission since 1992.  Dr. Kelly makes medication recommendations to Elgin, although the medication is actually prescribed by Dr. Raftery and administered at Elgin.  Dr. Kelly testified that defendant is not presently subject to involuntary admission but should be conditionally released pursuant to the 1997 plan and the 1999 transitional plan.  Dr. Kelly believes that both plans have taken into account defendant's difficulties with transitional periods, but the Lithium helps defendant deal with these stressors which led to the crimes.

Stephen Fossing, a licensed clinical social worker at Northwest, has seen defendant in individual counseling for community integration on a biweekly basis since 1996.  Fossing is the supervisor of the Psychosocial Rehabilitation Program.  Fossing counsels defendant on concrete issues surrounding defendant's transition to living in the community, including employment, money and medication management, community perceptions, and family issues.  Fossing stated that defendant has remained clinically stable over the three years that he has known him.  Under the release plan he will see defendant every other week.  He believes he would detect any decompensation on defendant's part since decompensation is a gradual process and  symptoms would be manifested within two to three days.  Since defendant will be seen by a variety of staff members, any decompensation will be identified.  He also believes defendant can provide for his basic needs if released, and he recommended defendant's conditional release. 

Dr. Orest Wasyliu, a psychologist and Director of Adult Clinical Psychology at Isaac Ray, has performed psychological assessments of defendant four times since 1990.  He administered the MMPI, MCI3 and Rorschach tests and agreed with Dr. Zoot's finding that defendant's test results showed a tendency to avoid self-disclosure, which could be an indication of a lack of insight.  However, the results of these and other tests showed no evidence of any psychotic disorder but rather substantial improvement in terms of personality functioning.  Dr. Wasyliu stressed that defendant must continue in treatment and understands this.  He believes the release plan adequately addresses the concerns expressed by Drs. Zoot and Gruenberg.

Dr. William Raftery, chief of psychiatry at Elgin's William White cottage where defendant currently resides, stated that defendant suffers from Bipolar Disorder II, which is in full remission.  He is concerned that defendant's present medication may be insufficient to control his illness once he is subjected to the additional stresses he will encounter upon conditional release.  Therefore, his medication may need to be reassessed subsequent to his release.  Dr. Raftery testified that defendant's history shows that should he severely decompensate, he would likely be a danger to himself or others.  In spite of these concerns, he is comfortable with the conditional release plan prepared by DHS and does not believe it is likely that defendant will decompensate if released.

The court granted DHS' recommendation after concluding that defendant was no longer subject to involuntary admission or in need of mental health services on an inpatient basis.  The State moved for reconsideration which was denied.  The trial court entered a final order granting defendant's conditional release.  The order incorporated the terms of the Transitional Plan, and added the following six conditions:

During Phase I, defendant must notify Elgin by 

telephone when arriving at and leaving Isaac

Ray or Northwest.

Phase II of the transitional plan shall not begin

earlier than 90 days from the date of the Court's 

order.

During Phase II and following defendant's full

time placement in Northwest's Scattered Sites

Program, defendant must submit to blood testing

twice per month to monitor his lithium levels.

During Phase II and following defendant's full

time placement in Northwest's Scattered Sites

Program, defendant must be placed at a residential

location that is the greatest distance practicable

from the residence of Annette Robin's family.

After 30 days, Elgin shall submit a written report

that details defendant's progress in treatment, 

and make additional recommendations, if any, for

implementation during the remainder of Phase I or

in Phase II.

During Phase II, Northwest and Isaac Ray must 

cooperatively submit written reports every 90 days

regarding defendant's progress in treatment and 

compliance with the conditions of his release.

In addition, the circuit court specified that defendant must comply with the rules and requirements of Elgin, Isaac Ray, and Northwest.

The State argues that the circuit court abused its discretion in granting DHS' petition to conditionally release defendant when the State proved by clear and convincing evidence that defendant was in need of mental treatment.  Defendant responds that the State failed to prove by clear and convincing evidence that he was either subject to involuntary admission or in need of mental health services on an inpatient basis.  730 ILCS 5/5-2-4(h) (West 1999). 

The State is incorrect in stating that the standard of review is abuse of discretion.  The burden is upon the State to prove by clear and convincing evidence that defendant is subject to involuntary commitment based on his mental condition.  
People v. Williams
, 140 Ill. App. 3d 216, 227, 488 N.E.2d 649, 660 (1986).  However, it is the province of the trier of fact, not the psychiatrists, to weigh all the evidence presented.  
Williams
, 140 Ill. App. 3d at 226, 488 N.E.2d at 659.  The trial court's determination will be reversed only if it is manifestly erroneous.  
People v. Hager
, 253 Ill. App. 3d 37, 42, 625 N.E.2d 232, 236 (1993); 
People v. Cross
, 301 Ill. App. 3d 901, 912, 704, N.E.2d 766, 773 (1998).

A defendant who has been found not guilty by reason of insanity is subject to involuntary admission only if he is mentally ill and because of his mental illness is unable to provide for his basic physical needs so as to guard himself from serious harm.  730 ILCS 5/5-2-4(a)(1)(A) (West 1999); 
Hager
, 253 Ill. App. 3d at 41, 625 N.E.2d at 236; 
People v. Grant
, 295 Ill. App. 3d 750, 758, 692 N.E.2d 1295, 1300 (1998).  An NGRI acquittee is in need of mental health services on an inpatient basis only if he is not subject to involuntary admission but is reasonably expected to inflict serious physical harm upon himself or another and would benefit from inpatient care or is in need of inpatient care.  730 ILCS 5/5-2-4(a)(1)(B); 
Hager
, 253 Ill. App. 3d at 41, 625 N.E.2d at 236; 
Grant
, 295 Ill. App. 3d at 758, 692 N.E.2d at 1300.

Once a criminal defendant is involuntarily admitted, he may be held only as long as he is both mentally ill and dangerous.  
Hager
, 253 Ill. App. 3d at 41, 625 N.E.2d at 236.  As a matter of due process, it is unconstitutional for a State to confine a harmless, mentally ill person.  
Hager
, 253 Ill. App. 3d at 41, 625 N.E.2d at 236.
  A finding that an insanity acquittee is subject to involuntary admission or is in need of services must be based upon explicit medical opinion regarding the insanity acquittee's future conduct and cannot be based upon a mere finding of mental illness.  
Grant
, 295 Ill. App. 3d at 758, 692 N.E.2d at 1300-01.  The possibility that an insanity acquittee might have difficulty adjusting to the stresses of noninstitutional life is insufficient to sustain the denial of conditional discharge.  
Grant
, 295 Ill. App. 3d at 761, 692 N.E.2d at 1302.

A careful review of the record, and the testimony of both defendant's and the State's witnesses, clearly showed that defendant was not a danger to himself or to others.  Dr. Kelly opined that he did not believe defendant was subject to involuntary admission or in need of mental health services on an inpatient basis.  He did not believe that defendant was a danger to himself or others nor, as an outpatient, would defendant be dangerous to himself or others as long as he complies with treatment.

Dr. Green did not believe that defendant was dangerous to himself or others, nor did he envision defendant becoming dangerous during his transition from Elgin.  Ron Wedell testified that defendant would no longer benefit from inpatient treatment.  He also did not believe that defendant would inflict physical harm upon himself or others.

Steve Fossing testified that he did not observe any evidence of dangerousness in defendant since the start of therapy with him in 1996.  He believed that defendant had obtained maximum benefit from inpatient care, and that defendant was now able to provide for his basic needs.  Dr. Wasyliu testified that he did not identify any dangerousness on defendant's part and that there was no reason to expect such dangerousness as long as defendant follows his treatment plan.  He also stated that defendant can provide for his basic needs and protect himself from serious harm.

In general, defendant's treatment team found that he has not engaged in a single physical or inappropriate verbal confrontation with another patient or staff member since his transfer to White Cottage.  In addition, defendant has not had any problems in using his on-site or off-site privileges.  All of defendant's witnesses stated that he was ready for conditional release, including Dr. Raftery who does not believe that it is likely that defendant would decompensate if released.

Dr. Gruenberg testified that she felt it would be appropriate to allow defendant unsupervised off-ground passes for therapy and treatment purposes only, which is Phase I of the Transitional Plan.  She felt that if defendant were to decompensate it is possible that he would be a danger to himself or others.  She did not testify that he was presently a danger to himself or others.  Dr. Zoot's opinion was that if depression recurred in defendant and he decompensated and became fairly psychotic, there is a probability that he would be a harm to himself and others.

Based upon the foregoing, we do not find that the trial court's determination was manifestly erroneous.

The State argues, however, that the stresses of noninstitutional life would be difficult for defendant, and that he would decompensate, which would lead to psychosis, and a risk of dangerousness.  However, this is speculation on the State's part.  In addition, under 
People v. Blumenshine
, 72 Ill. App. 3d 949, 391 N.E.2d 232 (1979), to deny conditional release on this basis would result in a "self-fulfilling predicament or catch-22" for defendant because of the sterility of the hospital environment, the defendant's behavior in the real world remains uncertain and because of this uncertainty he must remain hospitalized.  
Blumenshine
, 72 Ill. App. 3d at 955, 391 N.E.2d at 236.  We reject this argument.

The State contends next that if defendant fails to take his medication, he could decompensate and become dangerous.  We reject this argument as well since the possibility that defendant may not comply with the prescribed treatment is not sufficient to sustain the State's opposition to conditional release.  
People v. Smith
, 126 Ill. App. 3d 5, 9, 466 N.E.2d 1226, 1228 (1984).

Finally, the State claims that the circuit court did not consider all relevant factors in determining conditional release.  Under these factors the State includes the failure to consider the murders, whether defendant failed to take his medication in the past, whether he has a support system, any "guarded impulses" which defendant may have, and whether defendant committed any bad acts while in a controlled setting.

Section 5-2-4 states the relevant factors for involuntary admission, namely, mentally ill and dangerous, or mentally ill and unable to care for basic physical needs.  Relevant factors in determining a person's dangerousness include evidence of (1) prior hospitalization with the underlying facts of that hospitalization and (2) defendant not taking his medication in the past and still not perceiving the value of continued medical treatment.  
Washington
, 167 Ill. App. 3d at 80, 520 N.E.2d at 1163.  Factors that are not sufficient to sustain a finding of involuntary commitment include violations of conditions of release and the possibility that defendant may not comply with the prescribed treatment.  
Hager
, 253 Ill. App. 3d at 42, 625 N.E.2d at 236.

 In rendering its order, the court stated that: 

“The Court has considered all of the evidence in the case, the witnesses, the testimony, the exhibits and the stipulations.

The Court is going to mention some of the evidence, but the Court will stress that the issue in the case is whether the defendant is mentally ill and because of his mental illness he is reasonably expected to inflict harm on himself or others.

***

Initially, People versus Csyz, ***, says that the decision to commit must be based on the defendant's present conduct and state of mind. *** Conduct in the distant past, the Court does not feel is relevant.  Conduct in the recent past, the Court feels is relevant.  And that's what the case law provides.”

Furthermore, in the State's motion to reconsider, the 

court stated:

“The Court has considered the Petitioner's history in this case, the mental history, or the history of mental problems before the day in question, the acts on the day in question, as well as defendant's acts since he has been in the Department of Mental Health.”

There is nothing in the record which indicates the court excluded any evidence in arriving at its determination.  Clearly some evidence was assigned greater weight and had greater significance in the court's determination than other evidence; however, this the court, as the trier of fact, may do.

As a final point, at oral argument, the State argued that the circuit court in ordering defendant's conditional release,  stated that it would not consider any evidence relating to defendant's murder of his wife and daughter.  However, this court has made a thorough perusal of the record and, other than the statements of the court quoted above, we have found no evidence that the court refused to consider the murders at all.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

HOFFMAN, P.J, and HALL, J., concur.

FOOTNOTES
1:
The Transitional Plan was developed by DHS to reintegrate defendant into society.  Phase I called for defendant's use of unsupervised off grounds passes to travel by train from Elgin to the Issac Ray Center(IRC) for individual and group therapy.  The purpose of this step was to test potential stressful experiences in the community for defendant and to evaluate his responses to them.  Phase II was to begin three months later and involved a series of progressive home visits at the Alexian Brothers Northwest Mental Health Center (NWMHC) scattered site housing program.  Throughout the home visit process which would take approximately two months, ongoing assessment and communication would be maintained.  Upon successful completion of this transitional plan, defendant would be discharged pursuant to the DHS recommendation for conditional release.