THIRD DIVISION

    December 2, 1998

No. 1--97--3389

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of 

Plaintiff-Appellee, ) Cook County.

) 

)

v. )

)

) 

JOHN CROSS, ) Honorable

) Joseph J. Urso,

Defendant-Appellant. ) Judge Presiding.

JUSTICE BURKE delivered the opinion of the court:

Defendant John Cross appeals from an order of the circuit court denying him two of four supervised off-grounds passes from the Elgin Mental Health Center.
(footnote: -6)  On appeal, defendant contends that the trial court's judgment was against the manifest weight of the evidence and that it erred in placing the burden of proof upon him as to whether the passes should be granted.  For the reasons set forth below, we affirm.

In 1981, defendant, believing he was acting on orders from God, murdered two women and attempted to murder another woman and her husband after invading their home in order to kill "witches and warlords [warlocks]."  Defendant was found unfit to stand trial in 1981.  In 1982, defendant was found not guilty by reason of insanity, remanded to the custody of the Illinois Department of Mental Health and Developmental Disabilities (DMHDD), and subsequently resided at the Elgin Mental Health Center (Elgin).  Over the course of 15 years, defendant received treatment for his illnesses, which included schizophrenia, paranoid type, alcohol abuse, and other narcotics abuse.  On October 26, 1995, Elgin's director recommended defendant receive unsupervised on-grounds passes and supervised off-grounds passes.  On January 25, 1996, the trial court held a hearing and, based on its determination that the State bore the burden of proof, granted the unsupervised on-grounds passes, but denied the supervised off-grounds passes.  Defendant appealed the denial of the supervised off-grounds passes, and we remanded the cause, holding that the trial court erred in placing the burden of proof on the State.  
Cross I
, 289 Ill. App. 3d 876.  More specifically, we found that defendant, not the State, had the burden of proof in the hearing to modify his treatment plan pursuant to section 5--2--4(b) of the Unified Code of Corrections (730 ILCS 5/5--2--4(b) (West 1996)).  Subsequently, the need for further hearings on the October 26, 1995, pass recommendation was rendered unnecessary by the filing of a new recommendation with the trial court by Elgin's director on April 9, 1997, again requesting supervised off-grounds passes in behalf of defendant for the purpose of continuing his treatment.  Specifically, the Director, based on defendant's treatment team's recommendation, sought four passes for defendant to: (1) "attend outpatient group psychotherapy at the Isaac Ray Center"; (2) "attend an outpatient chemical dependency group in the community"; (3) "visit with his children" at his mother's house; and (4) "attend other supervised off-ground activities which the Treatment Team deems beneficial," including visits to half-way houses and a community reintegration program.  

At a hearing on August 18, 1997, on the director's recommendation, defendant presented two witnesses.  Albert Stipes, M.D., a forensic psychiatrist employed by the Forensic Clinical Services of the Cook County Circuit Court, testified that he examined defendant on May 19, 1997, pursuant to court order.  Stipes diagnosed defendant's illness as "[s]chizophrenia, paranoid type, in partial remission with medication and polysubstance abuse."  Stipes based his diagnosis on his personal examinations of defendant in 1997 and 1993, as well as records from Forensic Clinical Services and Elgin.  Stipes stated that defendant was currently receiving medication for his illness through an injection every 28 days.  It was Stipes' opinion that defendant was not a risk to harm himself or others, able to "provide for his basic physical need as to guard himself from serious harm," not subject to involuntary admission, and ready for the type of passes requested.  Stipes further stated that the passes would not interfere with defendant's medication or treatment, would enhance his treatment, would not lead to a resumption of drug use, would not lead to an escape, and would provide reasonable assurances of public safety.  In Stipes' opinion, the passes "[were] necessary to assure his [defendant's] progress.  It's part of the treatment."  Stipes characterized defendant's behavior as "cooperative with the staff and *** no incidents of violent behavior or any threat to others or harm to others or to himself during his stay."

  On cross-examination, Dr. Stipes stated that defendant's treatment records began in 1993, but that defendant's mental illness existed for a long period of time before that.  Stipes limited his testimony on direct examination to incidents of violence during the period from 1993 onward only.  However, Stipes stated he was aware that in November 1993 defendant became hostile to staff when they suggested that he increase group and socialization activity, and as a result, defendant was placed in another unit for observation after this incident.  In addition, in April 1994, defendant became sexually involved with another patient which resulted in the birth of twin girls.  This activity resulted in defendant's privileges of living in the William White Unit (a less restrictive unit within Elgin) being revoked.  Stipes further stated that defendant still resided in a more secure unit at Elgin, and had not regained his privilege of living in the William White Unit.  Stipes admitted that since defendant began receiving the injections of the medication Haldol, there was an incident, in February 1996, when he refused to take another medication, Cogentin, designed to counteract the adverse side effects of the Haldol.  Stipes also testified that in December 1994, defendant was provoked by another patient and responded by slapping the patient, but Stipes did not consider this an incident of violence since defendant was provoked; in February 1996, defendant asked the staff for a month off from any events or programs because he did not want to participate; defendant had always been considered a "loner" and the staff and doctors attempted to get defendant to integrate himself and become more social; in May 1997, defendant reiterated his desire not to integrate himself into the community; and defendant had indicated that he did not feel he needed anymore therapy, either psychiatric or polysubstance.  

Raymond Sipowicz, a psychologist at Elgin, who had been defendant's individual counselor for approximately two years at the time of the hearing, also testified in behalf of defendant.  Dr. Sipowicz stated that he had had contact with defendant for approximately a total of 3-1/2 years.  He met with defendant once a week for individual counseling, which increased to twice a week upon defendant's request.  Over the last few years, defendant had become "much more expressive," and "much more concerned about what's going on within himself and within his behavior."  Sipowicz concluded that defendant's request for more counseling sessions was "a positive indication of some personal growth."  Sipowicz made his determination about recommending the supervised off-grounds passes after reviewing all of defendant's records, as well as his own personal examinations of defendant.  Sipowicz's opinion was that defendant's illness went into remission around 1990 based upon the behavioral changes he noticed in defendant.  Defendant became less aggressive and irritable, stopped having hallucinations and became better at handling stress.  According to Sipowicz, the recommended passes would not interfere with defendant's continued medication, cause him to resume using illegal drugs, cause him to harm himself or others, or pose a threat to public safety and, would in fact, further his treatment.  Sipowicz further stated that at the time of the hearing, defendant had unsupervised on-grounds passes, which allowed defendant to move around different parts of Elgin to attend different activities without being directly supervised by a staff member.  Throughout the period that defendant had these on-grounds passes, he followed the rules, never tried to escape or to injure himself or others, and the passes allowed defendant to interact and socialize with other patients, furthering his integration treatment. 

Dr. Sipowicz further testifed that the facility director's recommendation for the passes arose out of an evaluation of defendant by the Isaac Ray Center that recommended working to integrate defendant slowly back into the population.  According to Sipowicz, some of the steps Isaac Ray and his treatment team sought to employ with defendant were visits to half-way houses, evaluation of his home and neighborhood, and community reintegration which involved visits to local malls, libraries, and learning to use public transportation.  Sipowicz further stated that "one of the thrusts of the Isaac Ray report *** [was] that that man [defendant] has only known a very structured secure setting for a long time and needs to be able to just get out and see what the outside world is like."

The State cross-examined Dr. Sipowicz regarding defendant's need for treatment and whether defendant's progress was significant.  Sipowicz acknowledged that defendant required "supportive counseling," as well as medication to keep his illness in remission.  With respect to defendant's monthly injections of medication, Sipowicz stated they were begun after several problems with defendant failing to take his medication prior to 1990.  Sipowicz also acknowledged that for five days in February 1996, defendant refused to take his Cogentin, and in May 1996, a notation in one of Sipowicz's reports showed that defendant lacked motivation regarding his substance abuse group; defendant was of the opinion that he no longer needed substance abuse counseling, even though the staffs at both Elgin and Isaac Ray both believed he did.  Sipowicz further stated that in February 1996, defendant "experienced very complex emotional reactions [and] *** was frustrated and discouraged by the [trial] Court's rulings."

Sipowicz further testified that he was aware that in April 1994 defendant allegedly became aggressive with a staff member who had asked defendant to turn down his radio.  Sipowicz also stated that in May 1994, defendant indicated that he could determine which people were righteous and which were not righteous by looking for a white aura around the person.  Sipowicz stated that he did not consider this necessarily a delusion, and explained that it is difficult to differentiate between some delusions and religious beliefs.  Sipowicz went on to compare defendant's beliefs with those of people who believe in angels.  Further, Sipowicz acknowledged that in December 1994 defendant was involved in a physical altercation with another patient who had provoked him.  It was Sipowicz's opinion, however, that defendant's reaction was a result of provocation by a disruptive patient and that defendant attempted to avoid a conflict.  After the incident, defendant apologized for his actions.  

The State continued to cross-examine Sipowicz about incidents involving defendant after 1993.  Sipowicz stated that in December 1995 defendant was seen by a female staff member stroking his penis over his clothing.  The staff member interpreted it as inappropriate behavior directed toward her, but Sipowicz believed it was not directed toward the staff member, and that the staff member had simply walked past at an inopportune time.  Sipowicz admitted that defendant became upset when he was questioned about the incident, would not take responsibility for his actions, and was placed on restriction for a period of days.  Sipowicz also stated that when he was questioned by another staff member about the incident, defendant stated he committed the act because he "wanted some p****."  Sipowicz's interpretation of this statement was that defendant was merely angry over being questioned about his actions.  Sipowicz further stated that, in February 1996, the Elgin Fire Department responded to an alarm at the center causing defendant to become angry when his shoes became wet because of the actions of a staff member.  According to Sipowicz, defendant stated something to the effect that he "was going to get rid of that housekeeper," or that he "was gone [
sic
] to go kill that b****."  Sipowicz interpreted these outbursts as defendant merely evidencing his "intent *** to bring the matter to the attention of administration so they could remove [the housekeeper] from that position."  Sipowicz's notes from March 1996 also reflected that there were "[i]ssues of insight in [defendant's] judgment raised due to two incidents on his [defendant's] unit involving anger, becoming intimidating when he was upset."  However, according to Sipowicz, defendant had integrated himself into the Elgin community by working as a janitor throughout the center, eating, sleeping, talking, and otherwise socializing with other patients.  

The State further questioned Sipowicz about an April 1997 report by a doctor named Rafferty, another member of defendant's treatment team, which indicated that defendant's participation in social treatment "remains minimal."  Sipowicz admitted that in the latter part of 1997, it was defendant's opinion that there was little need for him to have continued extensive psychotherapeutic or other treatments.  Sipowicz stated it was his opinion that he could not "see much benefit from *** [defendant] receiving any other kind of psychotherapy at Elgin," and that continued treatment required the supervised off-grounds passes.  Sipowicz admitted that Dr. Rafferty's report noted that defendant's prognosis was "fair to guarded," but Sipowicz explained that the report pertained to defendant's status for a conditional release, and not for the issuance of supervised passes.

The State did not present any evidence, and after both parties rested, the trial court granted the request for defendant's supervised off-grounds passes to attend Isaac Ray and an outpatient chemical dependency group.  The court, however, denied the supervised off-grounds pass for visits between defendant and his children and the general pass for anything the treatment team deemed necessary, stating:

"[The court] will deny the request as to visits with defendant's mother and children, and I would certainly deny very strongly other unlimited visits that Elgin asks for at this time.

I believe this is a logical step.  The next step has to be met.  If he complies with this step, it is certainly possible the other steps will follow very quickly."

This appeal followed.

Defendant contends that the trial court erred in placing the burden of proof on him, rather than the State, and requiring him to prove by clear and convincing evidence that the passes should be granted.  More specifically, defendant argues that this court should reconsider its decision in 
Cross I
 because (1) our decision "contradicts earlier precedent"; (2) "the parties in 
Cross I
 did not have an opportunity to argue the issue of the burden of proof"; (3) "[t]he language of the statute does not support placing the burden of proof on the defendant"; (4) the "[l]egislative history supports putting the burden on the State"; (5) "[t]he results from the hearing currently being reviewed support reversal of the decision to put the burden of proof on *** defendant" because "the judge is given the authority to micro-manage the internal decisions of the Department"; (6) "[p]lacing the burden of proof on *** defendant risks violating *** [his] right not to be deprived of liberty without due process of the law"; and (7) "[e]ven if the court is correct in placing the burden of proof on *** [defendant], the court erred in making him assume the burden by clear and convincing evidence."  The State argues that the trial court properly followed the mandate of 
Cross I
, as the law of the case, as to the request for supervised off-grounds passes.

In 
Cross I
, defendant sought supervised off-grounds passes to further his treatment, as in the present case.  The trial court in 
Cross I
 had determined that the State had the burden of proof to prove that the court should not grant the passes.  
We held that in requesting pass privileges in behalf of defendant, "the burden of proof rested with defendant because the 'petition' for pass privileges was filed by the facility director in behalf of defendant for a modification of his treatment plan, as opposed to the director's filing of a petition seeking defendant's transfer to a nonsecure setting, discharge or conditional release."  
Cross I
, 289 Ill. App. 3d at 889.  We further held that "subsection (g) of section 5--2--4, which provides the only standard of review applicable to this section, requires that 'the findings of the court shall be established by clear and convincing evidence.' "  
Cross I
, 289 Ill. App. 3d at 891.  

In the case at bar, defendant relies on the same authority he relied upon in 
Cross I
 in support of his burden of proof argument (
People v. Reed
, 126 Ill. App. 3d 1020, 467 N.E.2d 1158 (1984); 
People v. Nelson
, 244 Ill. App. 3d 356, 614 N.E.2d 277 (1993); 
Report, Governor's Commission for the Revision of the Mental Health Code of Illinois
, (1977)), which we previously considered and rejected.  Defendant also makes the same arguments, and cites to 
Fasulo v. Arafeh
, 173 Conn. 473, 378 A.2d 555 (1977), regarding his burden of proof, deprivation of liberty and standard of proof arguments that he did in his petition for rehearing in 
Cross I
, which we also rejected in denying his petition.
  Defendant also filed a petition for leave to appeal from our decision in 
Cross I
, which the supreme court denied.  
Cross I
, 175 Ill. 2d 535.  Accordingly, the law established in 
Cross I
 is applicable to the case at bar and, therefore, we hold that the trial court did not err in placing the burden of proof on defendant by clear and convincing evidence.  

We briefly note that defendant's deprivation of liberty argument is speculative and without legal support.  Defendant's reliance on 
Fasulo
 is misplaced.  
Fasulo
 involved civilly committed persons who petitioned for 
habeas corpus
 relief challenging their confinement, and argued that due process consideration mandated periodic judicial review of the need for continued confinement, not the involuntary commitment of a defendant after a finding of not guilty by reason of insanity (NGRI), as here.  We also note that 
Fasulo
 is not binding authority on this court, and that the Illinois Uniform Code of Corrections (730 ILCS 5/5--2--4 (West 1996)) is applicable to a NGRI defendant, not the Mental Health and Developmental Disabilities Code applicable to persons civilly committed (405 ILCS 5/2--102(a) (West 1996)).  
People v. Owens
, 269 Ill. App. 3d 152, 154-55, 645 N.E.2d 483 (1994).  Moreover, as we stated in 
Cross I
, "no due process liberty interest is involved when a defendant seeks pass privileges; the defendant is not challenging his commitment to the state facility but, rather, seeks privileges subject to the court's approval, to modify his treatment plan during his commitment status."  
Cross I
, 289 Ill. App. 3d at 888.  Consequently, since the Uniform Code of Corrections controls defendant's commitment (see 
Owens
, 269 Ill. App. 3d at 154-55), not the Mental Health and Developmental Disabilities Code, we find that the requirement that defendant be held in a "secure setting," pursuant to the Uniform Code of Corrections (730 ILCS 5/5--2--4 (West 1996)), governs in the present case over the requirement, as defendant argues, that a person involuntarily committed be held in the "least restrictive environment," pursuant to the Mental Health and Developmental Disabilities Code (405 ILCS 5/2--102(a) (West 1996)).  See 
Owens
 269 Ill. App. 3d at 154-55.  Lastly, we further note that while defendant is correct that the "law of the case" doctrine is not applicable because the facility director filed a new recommendation for pass privileges, which is the subject of the case at bar, after we remanded 
Cross I
 for further proceedings, the law this court established in 
Cross I
 is nonetheless applicable to the issues of the burden of proof and the clear and convincing evidence standard.

Defendant next contends that the trial court's denial of the two supervised off-grounds passes was against the manifest weight of the evidence.  Defendant argues that he satisfied "the three-

part standard set out in 730 ILCS 5/5--2--4(b)" by evidence that there were "reasonable assurances" of his safety, the safety of others and that his treatment would continue uninterrupted and, therefore, the trial court was required to grant the passes.  The State argues that the trial court's decision was well supported by the record.  

Section 5--2--4(b) provides, in pertinent part:

"Such [treatment] plan 
may
 also include unsupervised on-grounds privileges, off-

grounds privileges, *** home visits and participation in work programs, but 
only
 where such privileges have been 
approved
 by 
specific court
 
order
, which order may include such conditions on the defendant as the court may deem appropriate and necessary to reasonably assure the defendant's satisfactory progress in treatment and the safety of the defendant and others."  (Emphasis added.)  730 ILCS 5/5-

-2--4(b) (West 1996).

The language of this section clearly gives the trial court wide discretion in granting and tailoring passes.  The statute provides that the trial court 
may
 grant the passes, and 
may
 impose conditions on those passes.  730 ILCS 5/5--2--4(b).  We agree with the State that requiring the trial court to grant the passes any time a defendant's treatment team requests them because the 
team
 believes they should be granted would defeat the purpose of the statute's language mandating that the passes 
may
 only be granted based on the 
trial
 
court's
 approval.  We therefore find that the clear language of the statute does not mandate that the trial court grant pass privileges solely because defendant's treatment team, including the facility director, recommends the passed be granted.

Defendant next argues the trial court's decision was against the manifest weight of the evidence because all the witnesses recommended granting the passes and because "[n]o evidence was presented to indicate that the passes would put *** [defendant] or the public in danger; "[t]here was no evidence indicating that *** [defendant's] treatment would *** be interrupted as a result of granting the passes; and "[d]enying the recommended passes is likely to interfere with *** [defendant's] continued progress and treatment."  The State argues that the trial court must consider all the evidence presented and then make a determination independent of the recommendation.  

In 
People v. Williams
, 140 Ill. App. 3d 216, 488 N.E.2d 649 (1986), the defendant was found not guilty by reason of insanity of attempted murder and aggravated battery.  The trial court, after an initial evaluation by the DMHDD, found the defendant subject to involuntary admission and ordered the defendant remanded to the DMHDD for 15 years.  On appeal, the defendant contended that there was no evidence to support his involuntary confinement because there was no "explicit medical opinion" that he was "reasonably expected to harm himself or others."  
Williams
, 140 Ill. App. 3d at 226.  In rejecting the defendant's argument, the 
Williams
 court first observed that while one doctor believed the defendant was subject to involuntary commitment and two others did not, "it is the trier of fact, and not the psychiatrists, who is to consider and weigh all the evidence in this case."  
Williams
, 140 Ill. App. 3d at 226; see also 
In re King
, 114 Ill. App. 3d 346, 352, 448 N.E.2d 887 (1983) (holding that since "the evidence as to whether the petitioner was mentally ill was conflicting, it was within the province of the trier of fact to resolve this issue").

Here, the evidence at defendant's hearing established that his doctors and counselors supported granting the passes.  Both doctors testified that defendant had made significant progress, and Sipowicz testified that he did not believe there was anything else Elgin could do to further defendant's treatment.  The doctors testified that defendant's and the public's safety could be reasonably assured, and would not interfere with his treatment.  Additionally, both doctors testified that the passes were necessary to defendant's continued progress.  However, the evidence also established that defendant had continued to have some problems over the past few years, including confrontations with staff and other patients, an improper sexual relationship, failed to take responsibility for some of his actions, lacked motivation toward his treatment, and denied the need for continued treatment.  Even though the experts provided their opinions concerning defendant's rationale concerning these problems, it was for the trial court to weigh these opinions with the other evidence and draw its own conclusions.  
Williams
, 140 Ill. App. 3d at 226.  Based on the record before us, we cannot say that it was unreasonable for the trial court to conclude that while defendant had made significant progress worthy of some supervised off-grounds pass privileges to continue his treatment progress, his continuing problems, as well as his admitted lack of motivation toward continued treatment, necessitated caution in granting defendant the specific two off-

grounds pass privileges which it denied him.  Therefore, we find that the trial court's decision to deny two of the supervised off-

grounds passes was not against the manifest weight of the evidence.

Defendant next argues that the "handful of incidents" and the circumstances under which his problems arose in the past "cannot be used to prevent him from receiving the passes for which he *** [was] recommended."  However, defendant fails to cite to applicable authority in support of his argument.  Nor does he demonstrate why the trial court could not consider past problems, especially problems that occurred within the recent past, in determining whether to grant the passes.  Instead, defendant merely states, relying on 
People v. Shelton
, 281 Ill. App. 3d 1027, 1034, 667 N.E.2d 562 (1996), that "even serious mental illness may be treated in a relatively short period of time," to suggest that mainly current, and not past, conduct should be considered by the trial court.  However, 
Shelton
 addressed an insanity acquittee's right to file petitions for discharge or conditional release (
Shelton
, 281 Ill. App. 3d at 1034); 
Shelton
 did not hold that past conduct may not be considered by a trial court in determining whether to grant pass privileges.

Defendant next argues that the "specific instances that the State brings up have no bearing on whether the elements of the statutory standard [
sic
] have been met."  Again, however, defendant fails to cite to authority supporting his assertion why the ability to interact with the staff and residents appropriately is not relevant to the trial court's determination whether granting certain pass privileges would place defendant or the public in danger.  Moreover, we believe that it would be reasonable, based on the evidence in the record, for the trial court to conclude that defendant's problems, including physical altercations with staff and other patients, indicated that defendant still posed a danger to himself and the public.  Consequently, we cannot say that the trial court erred in considering defendant's past behavior in denying the two supervised off-grounds passes.

Defendant next argues that his "current attitude should not be a barrier to his receiving the proposed passes."  Defendant was admittedly "not thoroughly interested in every aspect of his treatment."  Again, we believe that defendant's "attitude," given the evidence introduced at defendant's hearing of his belief that he needs no further psychiatric or polysubstance abuse treatment, which both the doctors at Elgin and Isaac Ray agree he needs, was a matter for the trier of fact and we cannot say that it was unreasonable for the trial court to consider this as a factor in concluding that the two passes at issue should be denied.

Defendant also argues that the trial court "should not second guess *** [the treatment teams's] decision [to recommend passes] without a reason.  *** Rather, the judge should defer to the decisions of those in the best position to be making them."  

We first observe that, contrary to defendant's assertion that the trial court did not give a reason for its denial of the passes, the gist of the trial court's ruling was that, based on the evidence it heard, it believed granting two of the passes while denying the two at issue here was "a logical step, [and that] [t]he next step has to be met.  If he complies with this step, it is certainly possible the other steps will follow very quickly."  Additionally, defendant cites to no authority requiring that the trial court specify its reasons for the denial of pass privileges.  Moreover, the fact that the trial court denied the two passes logically implies that the court believed defendant was a danger to himself or the public based on defendant's continued problems of interacting with staff and patients at times.  

Further, as discussed above, it is the trier of fact, not the psychiatrists, which is to consider and weigh all the evidence.  The trial court heard all the testimony by the doctors and had an opportunity to observe defendant throughout the hearing.  The evidence established that defendant had made progress recently, he had learned better control over his temper and anger, he had become somewhat more social, he no longer suffered from the delusions that caused him to commit the acts he was committed for, he had taken steps to begin preparing himself for release by learning a skill, he demonstrated an interest in providing for his daughters, his psychosis was in remission with the aid of medication, and he had sought out additional counseling in excess of what the treatment team had provided.  However, the evidence also established that defendant still failed to take responsibility for his actions at times, was not able to always control his temper, lacked motivation at the time for further treatment, believed he needed no additional therapy, had refused certain medications for no apparent reason, received his current medication through injections because in the past he had refused medication, and the Isaac Ray Center believed defendant needed a slow integration into the community beginning with treatment at the Center.  Given all these facts, we believe the trial court reasonably concluded that defendant had progressed to deserve the supervised off-grounds passes for further treatment at Isaac Ray and an out-patient chemical dependency group, but that, given the problems defendant continued to have, the supervised off-grounds passes for visits with his children in his mother's home and for whatever other treatment activities his treatment teams deemed necessary, were not appropriate.

Lastly, contrary to defendant's argument, the trial court was not limiting defendant's treatment.  The court in fact was providing by granting two of the passes at this time, what Dr. Sipowicz stated defendant needed; "some hope that he can some day lead a relatively normal life."  The trial court's determination that defendant was not ready for the passes to visit his children and mother outside of the hospital or a high level of reintegration without the additional therapy that everyone agreed only the Isaac Ray Center can provide was supported by the evidence that defendant still had problems with his anger, socialization skills, and his refusal to take responsibility for his actions.  Clearly, the trial court was in the best position to weigh the evidence, observe the witnesses, and observe defendant.  See 
Bazydlo v. Volant
, 164 Ill. 2d 207, 647 N.E.2d 273 (1995).  

In summary, we hold that the trial court's denial of the supervised off-grounds passes for defendant to visit his children and mother at his mother's home and for whatever other activities his treatment team felt necessary was not against the manifest weight of the evidence.  Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

CAHILL, P.J., and LEAVITT, J., concur.

FOOTNOTES
-6:     
The present appeal is defendant's fourth to this court.  In 
People v. Cross
, No. 1--87--0307 (1989) (unpublished order under Supreme Court Rule 23), we affirmed the trial court's denial of defendant's petition for discharge.  In 
People v. Cross
, 274 Ill. App. 3d 159, 653 N.E.2d 1308 (1995), we affirmed the trial court's determination that a natural life sentence is to be utilized as the maximum period of defendant's involuntary commitment.  In 
People v. Cross
, No. 1--95--1053 (1996) (unpublished order under Supreme Court Rule 23), we affirmed the trial court's order denying defendant's petition for unsupervised on-grounds passes and supervised off-grounds passes.  In 
People v. Cross
, 289 Ill. App. 3d 876, 684 N.E.2d 135 (1997), 
appeal denied
, 175 Ill. 2d 535 (
Cross I
), we determined that the trial court erred in placing the burden of proof on the State at the hearing on the petition for supervised off-grounds passes, and remanded the cause to the trial court for further proceedings.