2016 IL App (1st) 150555

THIRD DIVISION
June 1, 2016

No. 1-15-0555

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 91 C6 60917 |
| | ) | |
| MICHAEL BETHKE, | ) | Honorable |
| | ) | Frank G. Zelezinski, |
| Defendant-Appellant. | ) | Judge Presiding. |

**OPINION**

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Mason and Justice Pucinski concurred in the judgment and opinion.

¶ 1     In June 1991, defendant Michael Bethke decapitated a coworker, wrote in blood on the victim's forehead, and put the victim's head in a deli case. He was subsequently found not guilty by reason of insanity of first degree murder and admitted to Elgin Mental Health Center (EMHC) in the custody of the Illinois Department of Human Services.

¶ 2     In 2012, defendant's treatment team filed a report in support of a petition for treatment plan review, pursuant to sections 5-2-4(b) and (e) of the Unified Code of Corrections (Code) (730 ILCS 5/5-2-4(b), (e) (West 2010)), recommending that defendant be allowed "supervised off-grounds pass privileges." After an evidentiary hearing, the trial court denied the petition. On appeal, this court determined that the trial court failed to make findings of fact as required by section 3-816(a) of the Mental Health and Developmental Disabilities Code (405 ILCS 5/3-

816(a) (West 2010)), and remanded the cause to allow the trial court to enter more specific findings of fact and conclusions of law. See *People v. Bethke*, 2014 IL App (1st) 122502, ¶¶ 19-21. On remand, a second evidentiary hearing was held, and the trial court again denied defendant off-grounds pass privileges. Defendant now appeals contending, *inter alia,* that the court's decision was against the manifest weight of the evidence and improperly relied on the State's "non-evidentiary" questions and arguments. We affirm.

¶ 3                                          BACKGROUND

¶ 4      On January 27, 2015, at the second hearing, forensic psychiatrist Dr. Matthew Markos testified that he examined defendant on October 16, 2014. He had previously examined defendant on April 18, 2007, June 19, 2009, and July 26, 2012. Markos testified that defendant was schizophrenic and had received psychiatric treatment since 1991. Defendant had also been treated for substance abuse issues. Markos concluded, based upon his examinations of defendant and review of defendant's records, that defendant's mental condition was "improved" and stabilized by medication. Defendant was "mentally stable." Markos explained that defendant took anti-psychotic medications, as well as anti-depressant and anti-anxiety medication. Because schizophrenia is generally a "lifelong" disorder, defendant's treatment will be indefinite. If defendant stopped taking his medication, there was a risk that symptoms would reoccur within a few days to a week and render him psychotic. Markos had discussed defendant's medication with defendant. Defendant recognized that he had a mental illness and needed ongoing treatment. Defendant also understood the connection between his illness and the offense. To the best of Markos's knowledge, defendant had never refused to take his medication.

¶ 5     Markos acknowledged that he did not think defendant was "suitable" for on-grounds pass privileges in 2007. By 2009, however, defendant was suitable for such privileges because he was "more compliant" with medication and treatment, his behavior was more stable and he had received psychotherapy for frustration tolerance and anger management. Since defendant had been granted on-grounds pass privileges, Markos was not aware of any incident or any irregular behavior on his part. Off-grounds pass privileges would permit defendant to go to locations within the community, such as a library or movie theatre, as part of a group of six to eight patients under staff supervision. Markos testified that even if the trial court approved off-grounds pass privileges for defendant, the actual use of the pass would be subject to the discretion of EMHC staff. Markos did not believe that defendant posed an "elopement" risk.

¶ 6     In Markos's clinical opinion, even if defendant skipped his medication on a day that he left EMHC, it was unlikely that defendant would relapse that day or even the next because it takes time for symptoms to reappear. Defendant received his medication in the morning and evening and would not receive any medication while "out." The goal of pass privileges is to integrate a patient back into the community; it is progressive and done under supervision. Because defendant had utilized his on-grounds pass since 2009, he was now suitable for an off-grounds pass. It was Markos's opinion, within a reasonable degree of medical and psychiatric certainty, that defendant did not pose a danger to himself or others if he was granted off-grounds pass privileges. This was the "next step" in defendant's reintegration and rehabilitation.

¶ 7     During cross-examination, Markos testified that it was "reasonably safe" to say that defendant's frustration tolerance and anger management issues were under control. Markos was aware of a 2013 incident during which defendant showed "less frustration tolerance" by throwing

or knocking over a chair. Defendant was upset after a verbal altercation with another patient, which Markos conceded occurred in a controlled environment. However, defendant recognized the behavior, took responsibility, and apologized. As a result of this incident, defendant's on-grounds pass privileges were temporarily revoked, causing defendant to threaten not to take his medication. However, defendant complied with his medication regime, and since then there have been no reported incidents of anger or outbursts.

¶ 8    Markos acknowledged defendant had certain triggers, such as lack of sleep, but stated that lack of sleep or stress is a general trigger for anyone. Defendant is also triggered when he is questioned as to why he is still at EMHC, but Markos testified that such a trigger could apply to any patient "hospitalized for a period of time." Although defendant had "issues" with anger and frustration, Markos was unsure whether he could "pinpoint" the exact stressors. Defendant was upset by the events of September 11, 2001, but defendant did not have his medication "covered" at that point. In January 2014, defendant became frustrated when he was asked not to sleep with a bed sheet on his head and then could not sleep because of the anxiety caused by the request. Markos acknowledged that a progress note relating to this incident indicated a psychiatrist's concern with defendant's lack of frustration control. Defendant's pass privileges were also temporarily revoked after he shared candy and DVDs with other patients.

¶ 9    Markos could not predict whether defendant would come into contact with people who annoy him while off-grounds. Defendant gets annoyed by other patients' behavior. He acknowledged that defendant was a "large" man, but contended that this fact alone does not make defendant dangerous and that there were no reported incidents surrounding defendant's use of on-grounds pass privileges. Markos did not "discount" sleep disturbance and other stressors,

but defendant's "primary condition" was "under control" with anti-psychotic medication. Also, defendant would be under proper supervision. The fact that defendant had faced "issues" at EMHC indicated that EMHC is very careful with pass privileges. If defendant lost his privileges over candy, Markos expected "stringent" regulation with respect to off-ground pass privileges.

¶ 10     During redirect, Markos testified that to the best of his knowledge, defendant did not hurt anyone by flipping the chair and staff managed the incident in a "professional and appropriate manner." When defendant was told to remove the bed sheet from his head, he did not injure himself or anyone else. To the best of Markos's knowledge, defendant had not injured or threatened anyone during his years at EMHC. Although there were manifestations of defendant's frustration, anger is not a psychiatric symptom. During recross-examination, Markos agreed that defendant was in a controlled environment when he lost his temper and knocked over the chair.

¶ 11     Dr. Syed Hussain, a staff psychiatrist at EMHC, testified that he had treated defendant since 2014. His review of defendant's records revealed that at the time of the offense, defendant was depressed, agitated, paranoid and suffering from insomnia. Defendant heard "noises of a command [ing] nature" asking him to kill someone and had a history of alcohol and drug use. At the time of the hearing, defendant was not agitated, paranoid or irritable and was "sleeping pretty well." Defendant no longer heard voices. Defendant's schizoaffective disorder, bipolar type with psychotic features, was currently in remission due to medication. Defendant's medication was last adjusted in November 2013. Defendant also received therapy for his alcohol and substance abuse issues. Defendant understood his mental illness and the need for medication. To Hussain's knowledge, defendant had never refused to take his medication.

¶ 12    During his first five years at EMHC, defendant did not fully understand his illness and threatened at "times" to stop his medication. Defendant had been compliant since 1998, and his medications have been adjusted several times during that period. Defendant will need to take these medications for the rest of his life. At EMHC, defendant is called to the nurses' station for his medication each morning and night, and a staff member ensures that defendant takes the pills. "At the moment," defendant got along well with patients and staff. He interacts with other patients "pretty appropriately," and is appropriate and polite to staff.

¶ 13    Defendant was granted court-authorized unsupervised on-grounds pass privileges in 2009. This permits him to leave the "closed fenced building" and walk the grounds in a specific area for up to 30 minutes "about" twice a day. Most of EMHC's grounds are unfenced, and if defendant chose to "walk off," he easily could do so. In Hussain's opinion, defendant never attempted to escape because this "process" is supposed to help him obtain more privileges. Defendant's condition was "definitely better," so his doctors were asking for more privileges.

¶ 14    Hussain explained that a supervised off-grounds pass would permit defendant to leave EMHC, accompanied by staff, to attend an outpatient substance abuse program and to acclimate to community settings. Generally, these trips have a specific staff-to-patient ratio and are at the staff's discretion. If there were any "issues," such as defendant refusing to take his medication or getting into a fight, he would not be permitted to go. When defendant flipped a chair in 2013, his on-grounds pass privileges were suspended because he should have had "better control of himself." Hussain opined that defendant is "safe and sound to be able to obtain, engage, participate and utilize those passes." Although defendant has at times become frustrated and upset, he has not gotten into a physical altercation since 1998. Defendant has made and

continues to make "excellent progress." At this stage of his treatment, he would benefit from an off-grounds pass.

¶ 15    During cross-examination, Hussain testified that defendant did not currently have issues with frustration and anger. However, "frustration tolerance," or lack thereof, is not necessarily a sign of mental illness. He admitted that there was "no guarantee" that defendant's illness would not return, however, the symptoms can be controlled. Hussain explained that when defendant became frustrated about the temperature in his room, he came to staff and asked for help. In June 2013, he came to staff regarding another patient's derogatory racial comment and was told to stay away from people who made him upset and to seek staff assistance when necessary. In July 2013, when defendant flipped the chair, he then went to speak to staff. Although he threatened to stop taking his medication, he later relented. Staff was concerned about defendant's frustration level in January 2014, when he became upset after he was asked to remove a bed sheet from his head. However, Hussain did not recall defendant becoming violent or threatening during that incident. If defendant were to go off-grounds, he would be accompanied by staff so that if he was subject to interactions that frustrated him, staff could intervene "right away."

¶ 16    In denying defendant off-grounds pass privileges, the court stated that both doctors agreed that at the time of the crime defendant was schizophrenic and suffering from hallucinations, that because defendant took his medication the psychotic episodes were in remission and that defendant should be afforded off-grounds pass privileges. The court noted that although defendant took his medication, there were "episodes" of anger and in some instances violence and that defendant had shown "degrees" of frustration. The court highlighted the 2013 and 2014 incidents, which had occurred in the interim between the first and second hearings. The

court then stated that although defendant was disciplined as a result of those instances, they occurred in a "controlled environment." Off-grounds pass privileges would place defendant in an uncontrolled environment and the court's "main concern" was safety. In other words, if something "trigger[ed] defendant into one of his anger situations" the situation would be controlled by a limited number of staff members who were also responsible for the other patients on the trip.

¶ 17    The court had "questions" about defendant's anger and was being "asked" to take a gamble by allowing defendant to be in the "open public" when he still had anger episodes which can be triggered for any reason. Although both doctors testified that defendant's hallucinations were controlled and these incidents were "just matters of anger," they testified the episodes could be triggered by insomnia or "other factors." Ultimately, the court was concerned by "the potential of something violent occurring if some of the triggering factors occur." The court declined to "take the gamble" on defendant in light of the 2013 and 2014 incidents, but stated that it would "think differently" if defendant had a "clean slate."

¶ 18                              ANALYSIS

¶ 19    On appeal, defendant contends that the trial court's denial of off-grounds pass privileges was against the manifest weight of the evidence. Defendant further argues that the court improperly relied upon the State's "non-evidentiary" arguments and questions and improperly based its decision on the basis that it was not willing to take any risk.

¶ 20    When a defendant has been acquitted of a crime by reason of insanity, his subsequent treatment is governed by section 5-2-4 of the Code, which authorizes his involuntary commitment in order to treat his mental illness and also to protect him and society from his

potential dangerousness. 730 ILCS 5/5-2-4 (West 2010); *People v. Jurisec*, 199 Ill. 2d 108, 115-16 (2002). The request for off-grounds pass privileges from such a defendant is specifically governed by sections 5-2-4(b) and (e) of the Code. 730 ILCS 5/5-2-4(b), (e) (West 2010). Section 5-2-4(b) relates to inpatient mental health services after a person is acquitted by reason of insanity and says, in pertinent part, that the facility director shall file treatment plan reports which may include a request for off-grounds pass privileges. 730 ILCS 5/5-2-4(b) (West 2010).

¶ 21    When a petition for treatment plan review is filed, a hearing must be held within 120 days. 730 ILCS 5/5-2-4(e) (West 2010). If evidence is presented, the burden of proof remains with the defendant and the defendant must prove by clear and convincing evidence that the entitlement to certain pass privileges is proper. 730 ILCS 5/5-2-4(e), (g) (West 2010); see also *People v. Cross*, 289 Ill. App. 3d 876, 888-89 (1997). Section 5-2-4(b) requires that such privileges be approved by a court order which "may include such conditions on the defendant as the Court may deem appropriate and necessary to reasonably assure the defendant's satisfactory progress in treatment and the safety of the defendant and others." 730 ILCS 5/5-2-4(b) (West 2010).

¶ 22    On review, we will not reverse a trial court's determination as to whether a defendant met his burden pursuant to section 5-2-4(g) by clear and convincing evidence unless such a determination is against the manifest weight of the evidence. *People v. Wolst*, 347 Ill. App. 3d 782, 790 (2004). For a decision to be against the manifest weight of the evidence, it must appear that a conclusion opposite to that reached by the trial court, as trier of fact, is clearly evident. *Id.*

¶ 23    In the instant case, there was ample evidence to support the trial court's decision. The record reveals that the trial court's primary concern was defendant's "frustration tolerance" and

whether defendant could appropriately deal with frustration and anger outside of the controlled environment at EMHC. In 2013 defendant reacted to another patient's derogatory comment by flipping a chair over and threatening to not take his medication, and in 2014 defendant was unable to sleep and anxious after he was asked to remove a bed sheet from his head. The court acknowledged that during these incidents, defendant did not hurt himself or anyone else, but noted that each incident occurred in a controlled environment where staff was present to monitor the situation. The trial court contrasted the controlled environment of EMHC with the environment that defendant would face with an off-grounds pass, that is, an uncontrolled environment with fewer staff where anything could trigger defendant's frustration or anger. The court admitted that it would have thought differently about off-grounds pass privileges if defendant had appeared before it with a "clean slate," that is, without the two most recent incidents. See *People v. Cross*, 301 Ill. App. 3d 901, 911-12 (1998) (considering past behavior in denying supervised off-grounds pass privileges). In other words, although the evidence showed that defendant was progressing positively, it also established that defendant continued to exhibit anger and frustration.

¶ 24    Here, the record reveals that the trial court attempted to reconcile defendant's progress within the controlled environment at EMHC and the two recent anger episodes, with the fact that an off-grounds pass would place defendant in an uncontrolled environment with fewer staff members who could intervene if such an episode occurred. Indeed, one of the contemplated off-grounds activities included defendant's participation in group substance abuse therapy, an uncontrolled environment in which defendant may well not be the only participant with mental health or anger management issues.  If in the controlled environment of EMHC, the annoying

behavior of another patient prompted an outburst from defendant, it is not speculative to predict a like-or more severe-reaction in this uncontrolled and potentially volatile environment. The court denied off-grounds pass privileges, in pertinent part, because although both doctors testified that defendant's hallucinations were under control and these incidents were "just matters of anger," they agreed that these episodes could be triggered by insomnia or "other factors." The trial court was concerned that an incident could occur if defendant was subjected to a "triggering" factor while in public. This court cannot say that the opposite conclusion is clearly evident. See *Wolst*, 347 Ill. App. 3d at 790.

¶ 25     Defendant, on the other hand, contends that the trial court should not disregard the testimony of the two expert witnesses who agreed that defendant was suitable for off-grounds pass privileges. However, the trial court, as the trier of fact, properly weighed the experts' opinions, along with the other evidence presented at the hearing and formed its own conclusions. See *Cross*, 301 Ill. App. 3d at 910 ("requiring the trial court to grant the passes any time a defendant's treatment team requests them because the *team* believes they should be granted would defeat the purpose of the statute's language mandating that the passes *may* only be granted based on the *trial court's* approval" (emphases in original)).

¶ 26     We are similarly unpersuaded by defendant's reliance on *People v. Blumenshine*, 72 Ill. App. 3d 949 (1979). At issue in *Blumenshine* was whether the defendant, found not guilty by reason of insanity of the offense of murder, had established that he was entitled to a petition for discharge by clear and convincing evidence. After a hearing during which two psychiatrists recommended discharge with certain conditions, and the State concurred in that recommendation, the trial court denied the petition and rejected the experts' opinions. Contrary to

the witnesses' testimony, the trial court concluded that the evidence failed to clearly or convincingly establish that the defendant was no longer in need of treatment or that there was a reasonable assurance for the public's safety. On appeal, the court reversed because the trial court "erroneously" placed greater emphasis on its own determination that the proposed conditions of discharge "would not or could not be complied with satisfactorily, to the exclusion of adequate consideration of expert testimony." *Id.* at 953-54.

¶ 27 The facts in *Blumenshine* are distinguishable from those in this case. In that case, two psychiatrists and the State concurred that the defendant should be discharged subject to certain conditions, but the trial court denied the petition because the experts could not guarantee that the defendant would not become violent. In the case at bar, the State has not conceded that defendant should be afforded an off-grounds pass, and cross-examined both doctors extensively regarding defendant's treatment history, progress and prognosis. Additionally, the trial court noted that although the experts in this case testified as to defendant's progress, they also described two recent incidents during which defendant displayed low frustration tolerance and anger. It was significant to the trial court-and it is to us-that those incidents occurred in the interim between the first and second hearings. Unlike the court in *Blumenshine*, the trial court in the case at bar considered the experts' testimony and attempted to reconcile defendant's progress with his continuing manifestations of frustration and anger.

¶ 28 Defendant next argues that the trial court improperly based its decision on the State's "non-evidentiary" arguments and questions. We disagree.

¶ 29 Defendant appears to argue that rather than witness testimony, the trial court relied on the State's questions and arguments when making its decision, or, in other words, relied on facts not

in evidence. However, the trial court specifically referenced the testimony elicited at the hearing in making its findings. The trial court noted although both doctors testified that defendant's hallucinations were controlled and that the 2013 and 2014 incidents were "just matters of anger," both doctors acknowledged that that these episodes could be triggered by insomnia or "other factors." The court then explained its concern regarding "the potential of something violent occurring if some of the triggering factors occur" as both doctors agreed could happen. The record reveals that the trial court properly weighed the experts' testimony and then made its own conclusions based upon that testimony. See *Cross*, 301 Ill. App. 3d at 911. Defendant cites no authority for the proposition that the fact that the trial court ultimately found the State's arguments persuasive means that it disregarded the actual testimony and evidence presented at the hearing.

¶ 30    Defendant finally argues that the trial court improperly based its decision on unwillingness to take any risk "whatsoever," or, in other words, applied the wrong legal standard. Defendant argues that such a standard would mean that no one in his position would ever be granted off-grounds pass privileges because there is no such thing as a guarantee of future behavior.

¶ 31    However, the record reveals that although the trial court stated that it declined to "take the gamble" on defendant because of the 2013 and 2014 incidents, the court also stated that it would "think differently" if defendant had a "clean slate." Rather than the court demanding a guarantee that defendant was never going to be dangerous, it appears that the court was concerned about the proximity between defendant's most recent "anger episodes" and the evidentiary hearing and implied that its decision would have been different absent those

incidents. Defendant was required to show, by clear and convincing evidence, that an off-grounds pass was consistent with defendant's satisfactory progress in treatment, the safety of defendant, and the safety of others. See 730 ILCS 5/5-2-4(b) (West 2010). Defendant has identified nothing in the record demonstrating that the trial court misapprehended this standard or subjected defendant to a higher standard.

¶ 32    Ultimately, the record reveals that in denying defendant's off-grounds pass privileges, the trial court found that although defendant was progressing positively, the evidence also indicated he could easily relapse if he did not take his medication, and that even while medicated, defendant could be triggered into an anger episode. This court cannot say that the opposite conclusion is clearly evident (*Wolst*, 347 Ill. App. 3d at 790), and we therefore affirm the judgment of the trial court.

¶ 33                                    CONCLUSION

¶ 34    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 35    Affirmed.