**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190628-U

Order filed December 17, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Tazewell County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0628 Circuit No. 17-CF-593 |
| SONIA SMULLIN, | ) ) ) | Honorable Michael D. Risinger, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE LYTTON delivered the judgment of the court.
Justice Daugherity concurred in the judgment.
Justice McDade dissented.

_____

**ORDER**

¶ 1     *Held*:   Trial court did not err in finding that defendant needed involuntary inpatient mental health treatment.

¶ 2     Defendant, Sonia Smullin, was charged with two counts of aggravated battery (720 ILCS 5/12-3.05(d)(4) (West 2016)). In a stipulated bench trial, she was found not guilty by reason of insanity (NGRI) and involuntarily committed to the Department of Human Services (DHS) on an

inpatient basis. Smullin appeals from the order of commitment, claiming the trial court erred in finding that she was in need of inpatient mental health treatment. We affirm.

¶ 3                                              I. BACKGROUND

¶ 4        On December 5, 2017, defendant confronted staff at the Salvation Army. She yelled at them, and they asked her to leave. Officers responded to the scene and spoke with defendant in her vehicle a few blocks away. She said she did not like the Salvation Army because they hurt her children. The officers reminded her that she was barred from patronizing the store and warned her to stay away. Within an hour, a Salvation Army employee reported that defendant had returned to the store. Officers arrested her and transported her to the Tazewell County Jail. During intake, defendant lashed out at the correctional officers. She said that they were "witches" and that they would "burn in hell for [their] sins." Defendant struck one intake officer in the arm and was charged with two counts of aggravated battery.

¶ 5        After conferring with defendant, defense counsel moved for a fitness evaluation. Psychologist Jean Clore reported that defendant was 59 years old and suffered from bipolar I disorder, with mood-congruent psychotic features. She stated that defendant was not fit to stand trial but was likely to attain fitness within 12 months with medication. At the review hearing, the parties stipulated to the finding in Clore's report. The trial court entered an order finding defendant unfit to stand trial, but likely to attain fitness within 12 months. In the interim, the trial court ordered that defendant be placed in the custody of DHS for mental health treatment.

¶ 6        On October 24, 2018, DHS filed a report stating that defendant was fit to stand trial. Counsel requested that defendant be evaluated for mental health services, and the State did not object. The trial court ordered a revised fitness evaluation and directed that defendant be evaluated as to her criminal responsibility at the time of the offense.

2

¶ 7         Clore evaluated defendant again and filed her report with the court on February 25, 2019. In her report, she concluded that defendant lacked substantial capacity to appreciate the criminality of the alleged offenses due to mental disease, which she primarily diagnosed as schizoaffective disorder, bipolar type. The trial court reviewed the report, and, following a stipulated bench trial, found defendant NGRI. The court ordered that defendant be remanded to the custody of DHS on an inpatient basis for further evaluation and treatment. Defendant was subsequently admitted to the Alton Mental Health Center (Alton).

¶ 8         DHS staff evaluated defendant on April 17, 2019, and submitted an initial report to the court on May 23, 2019. The report noted that defendant had a primary diagnosis of schizoaffective disorder, bipolar type, and a secondary diagnosis of opioid, stimulant, alcohol, and cannabis use disorder with remission in a controlled environment. It also noted that defendant had a long history of mental illness, which included psychiatric hospitalizations and multiple episodes of homelessness. Defendant reported past hospitalizations beginning in 1976. In 2016, she was hospitalized at Methodist Unity Point in Peoria and diagnosed with bipolar I disorder. Defendant had a history of striking staff and peers during her hospitalizations. She frequently misinterpreted her surrounding, which caused "inappropriate aggressive responses." Her prior criminal conduct included battery charges in Florida and Illinois. The report also noted that defendant had a history of noncompliance with outpatient care and had "limited insight into her mental illness and her need for ongoing treatment."

¶ 9         On June 5, 2019, psychiatrist Claudia Kachigian filed a psychiatric progress report in which she determined that defendant was in need of inpatient treatment. She stated that defendant appeared delusional and frequently referenced conversations with God and witches. Kachigian noted that, in response to treatment, defendant was not swallowing her pills and her medication

had to be switched to liquid to stabilize her moods. Defendant was not cooperative with her evaluations and would not engage in discussion. She yelled and cursed at those attempting to treat her if they did not tell her what she wanted to hear or deviated from her beliefs. Kachigian's report indicated that defendant refused to cooperate with cognitive assessment but was aware of person, place, and situation.

¶ 10    The parties reconvened on September 16, 2019, for a commitment hearing to determine whether defendant should receive mental health treatment on an inpatient or outpatient basis. Rebecca Melloy testified that she was the intake officer who processed defendant when she arrived at the county jail. She described defendant as violent, emotional, and uncooperative. Defendant hit her arm while attempting to knock a taser gun out of her hand. During the altercation, defendant ranted and seemed to be speaking in tongues; she chanted continuously and was incoherent. After processing, defendant was detained in isolation for several days. Melloy testified that throughout her stay, defendant was erratic, violent, and frequently hysterical. She yelled and chanted constantly, and she would go for days without sleeping. Defendant also tried to harm herself by banging her head multiple times against the wall or the window.

¶ 11    On cross-examination, Melloy stated that defendant often refused to take her medication, but when she was medicated, her behavior improved slightly. She behaved less violently and was less erratic when she took her medication. Defendant did not physically injure anyone during her stay at the jail, nor did she injure Melloy when she attempted to knock the taser out of her hand.

¶ 12    Pursuant to stipulation by the parties, Dr. Kachigian testified as an expert in the field of psychiatry. She had been treating defendant at Alton since June 2019. She stated that defendant suffered from mood symptoms and psychotic symptoms. Her psychotic episodes involved beliefs in religious beings, such as witches and demons. Dr. Kachigian diagnosed defendant with

schizoaffective disorder, bipolar type, and prescribed several medications, including Olanzapine, Divalproex, Topiramate, and Lorazepam. She noticed marked improvement in defendant's mental health as a result of the medication. Now, she could have a conversation with defendant without defendant becoming aggressive or angry or requiring restraints as in the past. She could not recall any recent episodes in which defendant had acted out violently or had physically harmed herself or an Alton employee.

¶ 13    Regarding treatment, Dr. Kachigian recommended ongoing medication management. She testified that, in her medical opinion, defendant needed close medication supervision to monitor the effects of different medications and find the optimal treatment dosage. Dr. Kachigian was concerned that defendant might not remain compliant if she was released from care. She also expressed concern that defendant might physically harm herself or others, noting "I think she could pose a risk of harm to others if she does feel like she is threatened, which she can feel frequently." She described defendant's beliefs as harmful. In defendant's mind, her beliefs justified a violent response toward others, which had resulted in harm to defendant. Dr. Kachigian's primary concern was whether defendant would remain compliant with her medication if she were released. She stated that there was "not a lot" that could be done to ensure defendant complied with an outpatient medication regime.

¶ 14    When asked if she had a medical opinion as to whether inpatient or outpatient treatment would be better for defendant, Dr. Kachigian opined that the inpatient setting would be more appropriate. Specifically, she stated:

> "There are benefits to both. However, given what I've said, I think she does still
> pose a risk in the community. I don't think it's a major risk of harm to others, but I
> do think she still could become aggressive with minimal triggers."

5

Based on her evaluations, she believed that an "inpatient setting at this time is the most appropriate place for her." Following Kachigian's testimony, the trial court took judicial notice of the court file, including the progress reports and the psychiatric evaluations from DHS.

¶ 15     Defense counsel moved for a directed verdict, arguing that Dr. Kachigian had not testified that defendant posed a "major" risk of harm. He maintained the State failed to present clear and convincing evidence that defendant posed a serious risk of inflicting bodily harm to others and required inpatient treatment. The trial court denied the motion, finding that the State established a *prima facie* case. Defendant rested without presenting any witnesses.

¶ 16     The trial court found that defendant was in need of inpatient mental health services and remanded her to the care of DHS. The court noted that based on defendant's reported aggressive behavior and psychotic beliefs there was a reasonable expectation that she would seriously harm herself or others. The court found Dr. Kachigian's testimony that defendant was improving with inpatient treatment but lacked commitment to outpatient treatment was unequivocal and warranted continuation of inpatient services. At the conclusion of the hearing, the court stated:

> "She is improving. There's no way I'm giving up on that, so I will make the commitment, finding that by clear and convincing evidence, the standard has been met. The maximum out date will be May 5th, 2021."

¶ 17                                   II. ANALYSIS

¶ 18     Defendant argues that the trial court erred in determining that she needed involuntary inpatient mental health services. She claims that the State failed to prove, by clear and convincing evidence, that she was reasonably expected to inflict serious physical harm on herself or others.

¶ 19     After a finding of NGRI, section 5-2-4 of the Unified Code of Corrections directs the trial court to enter an order instructing DHS to determine if the defendant is in need of mental health

6

services. 730 ILCS 5/5-2-4(a) (West 2018). DHS has to provide the court with a written report of its evaluation. *Id.* The trial court must then hold a hearing to determine if defendant is "(a) in need of mental health services on an outpatient basis; (b) in need of mental health services on an inpatient basis; (c) a person not in need of mental health services." *Id.* The phrase "in need of mental health services on an inpatient basis" is defined as "a defendant who, due to mental illness, is reasonably expected to inflict serious physical harm upon [herself] or another and who would benefit from inpatient care or is in need of inpatient care." *Id.* § 5-2-4(a-1)(B). Commitment under section 5-2-4 serves two purposes: (1) it allows for the treatment of the individual's mental illness, and (2) it protects the individual and society from potential danger. *People v. Youngerman*, 342 Ill. App. 3d 518, 524 (2003). Once a NGRI defendant has been involuntarily admitted for mental health services, she may only be treated on an inpatient basis so long as she is both mentally ill and dangerous. *People v. Bethke*, 2014 IL App (1st) 122502, ¶ 18.

¶ 20        Clear and convincing evidence is required to establish that a defendant needs mental health treatment on an inpatient basis. *People v. Bailey*, 2016 IL App (3d) 150115, ¶ 21. "Such a finding 'must be based on an explicit medical opinion regarding the defendant's future conduct and cannot be based upon a mere finding of mental illness.' " *Id.* (quoting *People v. Grant*, 295 Ill. App. 3d 750, 758 (1998)). Factors to consider in determining whether a defendant is reasonably expected to inflict serious harm include: (1) prior hospitalization and the underlying facts surrounding the hospitalization; (2) refusal to take medication in the past; and (3) refusal to recognize the value of continued medical treatment. See *People v. Robin*, 312 Ill. App. 3d 710, 718 (2000). Although a reasonable expectation of serious physical harm is required, there does not need to be an expectation of immediate danger. *Bailey*, 2016 IL App (3d) 150115, ¶ 21.

¶ 21 A trial court's conclusion that a defendant is in need of mental health services on an inpatient basis will not be reversed unless it is manifestly erroneous. Id. at ¶ 22. A ruling is manifestly erroneous only "if it contains error that is clearly evident, plain, and indisputable." *People v. Hughes*, 329 Ill. App. 3d 322, 325 (2002).

¶ 22 Here, the trial court's determination that defendant required inpatient mental health services was not manifestly erroneous. Dr. Kachigian described defendant's behavior as delusional and aggressive with psychiatric symptoms. She noted that defendant's mood swings were "most concerning," as they included irritability and anger issues that were fueled by defendant's belief in witches and demons. While Dr. Kachigian acknowledged that defendant was currently taking her medication and her symptoms had improved, she still found that defendant was in need of mental health services on an inpatient basis. Specifically, she testified that, based on her opinion as an expert in psychiatry, defendant could be aggressive with "minimal triggers" and was a risk in the community. The DHS progress reports noted that defendant had been hospitalized for psychiatric reasons in the past and had a history of noncompliance with medications on an outpatient basis. Dr. Kachigian's report also indicated that defendant initially refused to take her pills and was not fully compliant with her therapy sessions. Dr. Kachigian testified that defendant's behavior had markedly improved while in inpatient treatment, but she expressed concern that medication management was responsible for her success and that her treatment would suffer in an outpatient setting. Further, the DHS psychiatric evaluation revealed that defendant has limited insight into her mental illness or the need for ongoing treatment. Based on Dr. Kachigian's testimony and the psychiatric reports and evaluations, the trial court's ruling is not clearly, plainly, or indisputably erroneous.

8

¶ 23    Defendant argues that Dr. Kachigian's testimony does not support the trial court's finding that defendant was reasonably expected to inflict serious physical harm on herself or others. Although Dr. Kachigian could not recall any recent acts of violence while defendant was an inpatient at Alton, the totality of her testimony overwhelmingly supports the trial court's determination of a reasonable expectation of physical harm. She testified that defendant's mood symptoms were concerning, that defendant was easily irritated, and that her anger issues and aggressive behavior often lead to a violent response. She further reported that defendant's aggressive behavior had resulted in violent outbursts and harm to defendant. She testified that, even with medication, defendant could still become aggressive with "minimal triggers." The trial court also reviewed defendant's prior psychiatric hospitalizations, the reports of aggressive behavior during those hospitalizations, and her noncompliance with outpatient care. These factors demonstrated that defendant is a person who, due to her mental illness, was reasonably expected to seriously harm herself or others and would benefit from continued inpatient care.

¶ 24                                    III. CONCLUSION

¶ 25    The judgment of the circuit court of Tazewell County is affirmed.

¶ 26    Affirmed.

¶ 27    JUSTICE McDADE, dissenting:

¶ 28    The majority holds that the trial court did not err in finding that the State had presented clear and convincing evidence that defendant Sonia Smullin was "in need of involuntary inpatient treatment." Instinctually I agree that inpatient treatment is in her best interest, but I do not believe that conclusion is compliant with the statute or finds adequate support in the evidence. I, therefore, respectfully dissent.

¶ 29        The statute contains two requirements for involuntary commitment for inpatient treatment: (1) a reasonable expectation that the person will inflict *serious* physical harm on him-/herself or another, and (2) the person would benefit from or is in need of inpatient care. 730 ILCS 5/5-2-4(a-1)(B) (West 2018). As these are stated in the conjunctive, both are required.

¶ 30        Looking at the second requirement first, there seems little doubt from the testimony and the record that Ms. Smullin would benefit from consistent treatment with appropriate medications, as they appear to mitigate the negative effects of her mental illness. Dr. Kachigian testified that the medical providers at Alton Mental Health Center were still in the process of attempting to settle on the right combination of medicines and the appropriate dosages to give Smullin the ability to control her symptoms and her behavior. Because, left unsupervised, the patient is non-compliant with her treatment plan, even if she does not need inpatient care, she obviously could benefit from it. I believe the second requirement has therefore, been satisfied.

¶ 31        The problem I have with the majority's analysis of the first requirement is that there is nothing in the record before us that indicates Smullin has ever seriously injured herself or anyone else. Nor do I see anything that suggests such a level of escalation should reasonably be expected. Smullin had suffered from her mental illnesses and their manifestations since at least 1976—a minimum of 43 years. During that time, she had made risky choices related to use of alcohol and other substances and her hospitalization history included striking out at staff and other patients and, on occasion, "inappropriate aggressive responses." What is conspicuously absent from this history is any evidence that she has done *serious injury* to herself or others.

¶ 32        Notably, the aggravated battery charge of which Smullin was ultimately found not guilty by reason of insanity arose from an incident that occurred when she was taken to the Tazewell County jail after creating a disturbance at the Salvation Army. The county jail intake officer

Rebecca Melloy characterized Smullin's conduct as "violent," reported that she had been struck on the arm when Smullin attempted to knock a taser from her hand, and described Smullin repeatedly banging her head against a wall and window. Yet with all of this, Melloy confirmed in her testimony that Smullin did not cause any physical injury to anyone.

¶ 33    Similarly, Dr. Kachigian expressly acknowledged Smullin did not pose "a major risk of harm to others" even though "she still could become aggressive with minimal triggers." *Supra* ¶ 14. While she opined that an inpatient setting would be more appropriate, she did not testify that Smullin was dangerous because she posed a threat of inflicting *serious* physical injury and was, therefore, "in need of mental health services on an inpatient basis." 730 ILCS 5/5-2-4(a-1)(B) (West 2018).

¶ 34    Finally, I would note that the trial court's finding that Smullin was improving with inpatient treatment but lacked commitment to outpatient treatment, while undoubtedly accurate, was not the clear and convincing evidence of dangerousness needed to warrant involuntary commitment for inpatient treatment.

¶ 35    For these reasons, I would reverse the circuit court's order of involuntary commitment.